DOYON, LIMITED, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 94–1074T.

United States Court of Federal Claims.

Aug. 12, 1998.

Wynne S. Carvill, San Francisco, CA, attorney of record, for plaintiff.

William K. Drew, Washington, D.C., with whom was Assistant Attorney General Loretta C. Argrett, for defendant.

## OPINION

REGINALD W. GIBSON, Senior Judge:

## INTRODUCTION

This tax refund case is pending before the court following a trial on the merits, respecting the second of three counts averred in plaintiff's complaint,[1] held in Washington, D. C., on December 1, 1997. Doyon, Limited (Doyon or plaintiff) seeks a refund of alternative minimum tax (AMT) and environmental tax allegedly overpaid for its taxable year

ended October 31, 1988, in the sum of $319,-409,[2] plus interest as allowed by law. Doyon alleges that the Internal Revenue Service erroneously failed to apply Treas. Reg. § 1.56–1(d)(6) so as to eliminate alleged intercompany payments, in the amount of $25,-200,000.00, from Doyon's consolidated adjusted net book income (ANBI) for purposes of calculating Doyon's alternative minimum taxable income (AMTI). In addition to the foregoing controversy, the parties have also jointly stipulated that Doyon is entitled to recover the sum of $2,119.51, representing interest and penalties overpaid for the taxable year ended October 31, 1988, plus interest as allowed by law. After a thorough review of the record evidence and with due consideration of the pertinent legal authorities, the court enters judgment for Doyon in the sum of $2,119.51, respecting the stipulated overpayment, but enters judgment for defendant on count two of the amended complaint with respect to Doyon's claim for a refund of AMT and environmental tax for the taxable year ending October 31, 1988.

## FACTS

### A. Background

Most of the relevant facts have been stipulated and are so found. Moreover, many of the operative facts underlying Doyon's second cause of action were found in the court's earlier opinion granting partial summary

1. Plaintiff filed its original complaint on December 19, 1994, and thereafter filed an amended complaint on May 10, 1995. References herein to the pleadings shall be to plaintiff's *amended* complaint. The first cause of action averred therein sought a refund of corporate income taxes in the sum of $746,942, plus $1,695,040 of assessed interest, which plaintiff allegedly overpaid for its taxable year ended October 31, 1988, with interest as allowed by law. On November 22, 1996, this court entered a partial summary judgment in favor of defendant with regard to this first count. *See Doyon, Limited v. United States*, 37 Fed.Cl. 10 (1996). Additionally, at that time, and pursuant to RCFC 54(b), the court entered judgment dismissing plaintiff's first cause of action. Plaintiff's third cause of action seeks a refund of taxes allegedly overpaid in the sum of $1,047,325 for its taxable year ended October 31, 1990, with interest as allowed by law. The parties have entered into a partial settlement agreement concerning this third cause

of action, pursuant to which the refund payable to plaintiff, if any, is contingent upon the ultimate resolution of the litigated issues arising from plaintiff's taxable year ended October 31, 1988, *i.e.*, the first two counts averred by plaintiff. *Id.* at 11 n. 1; JX 1 at 2, ¶ 6. Pursuant to the aforesaid partial settlement, this opinion's conclusion, *infra*, enters judgment as to certain stipulated facts pertinent to Doyon's third cause of action.

2. Said amount is comprised of: (i) alternative minimum tax payable under I.R.C. § 55, in the amount of $301,319; and (ii) environmental tax payable under § 59A, in the amount of $18,090. Complaint at 9, ¶ 29. Unless otherwise stated, section references herein are to the Internal Revenue Code of 1986, Title 26, U.S.Code, as in effect during Doyon's taxable year ended October 31, 1988. Jurisdiction is premised upon I.R.C. §§ 6532(a) and 7422(a), and the Tucker Act, 28 U.S.C. § 1491(a)(1).

judgment in the Government's favor with regard to Doyon's first cause of action, and need only be summarily restated here. *See Doyon*, 37 Fed.Cl. at 11–17.[3]

Doyon is an Alaska Native Corporation (ANC) incorporated on June 16, 1972, pursuant to the Alaska Native Claims Settlement Act (ANCSA) of 1971.[4] For its taxable year ended October 31, 1987, Doyon incurred a substantial net operating loss (NOL), over $400 million of which was carried forward and claimed as a deduction for Doyon's taxable year ended October 31, 1988. During its taxable years ended October 31, 1987, and October 31, 1988, Doyon and several *unrelated* corporations entered into contractual arrangements, pursuant to which Doyon's massive NOLs were used to shelter certain income of said unrelated corporations from taxation. At that time, ANCs were permitted to *sell* unused tax benefits in this fashion pursuant to § 60(b)(5) of the Deficit Reduction Act of 1984 (DEFRA),[5] as amended by § 1804(e)(4) of the Tax Reform Act of 1986,[6] and by § 5021 of the Technical and Miscellaneous Revenue Act of 1988 (TAMRA).[7] The parties' dispute at bar centers upon the tax consequences, with respect to Doyon's taxable year ended October 31, 1988, regarding four such transactions. Marriott Corporation (Marriott) and Campbell Soup Company (Campbell) were each a *purchaser* of a portion of Doyon's tax benefits in two separate

transactions, while Hilton Hotels Corporation (Hilton) was the *purchaser* in the remaining two transactions. *See Doyon*, 37 Fed.Cl. at 13–16. Doyon's second cause of action, the subject trial on the merits, is principally concerned with the two Hilton transactions, which are described below, *seriatim*.

### B. *The Hilton Transactions*

#### 1. *Hilton I Transaction*

Pursuant to a stock purchase agreement executed on December 18, 1987, Doyon acquired 100 shares of the Class A common stock of HIL–A VII Corp. (Corp.VII), a newly formed Nevada subsidiary of Hilton. This agreement was calculated to permit the subsequent inclusion of Corp. VII's income in Doyon's consolidated federal income tax return. *Doyon*, 37 Fed.Cl. at 15. Corp. VII's affiliation with Doyon, for consolidated tax return purposes, lasted but 13 days inasmuch as Hilton repurchased the 100 shares of Corp. VII's Class A common stock from Doyon for $101 on December 31, 1987. During said brief affiliation with Doyon, Corp. VII recognized $40 million in gross income which Hilton previously assigned to Corp. VII in furtherance of the parties' tax-sheltering arrangement. *Doyon*, 37 Fed.Cl. at 15. This $40 million of gross income was thereafter reported in Doyon's consolidated tax return

---

**3.** The stipulations of facts and underlying documentary exhibits admitted into evidence at trial are identical to the stipulations of facts and documents upon which this court entered summary judgment in the Government's favor on Doyon's first cause of action, save that certain documents not relevant to Doyon's second cause of action were not introduced at trial.

**4.** Pub.L. No. 92–203, 85 Stat. 688 (1971), 43 U.S.C. §§ 1601–1629 (1988). *See Doyon*, 37 Fed. Cl. at 12–13 (explicating the history and purpose of the ANCSA).

**5.** Pub.L. No. 98–369, 98 Stat. 494, 579. Section 60(b)(5) temporarily exempted ANCs from the prerequisite 80% equity-ownership requirement of I.R.C. § 1504 for filing consolidated income tax returns, so as to permit ANCs to affiliate with other corporations for the purpose of sharing (*i.e.*, selling) tax benefits. *See* 132 Cong.Rec. S14,946 (June 23, 1986) (statement of Sen. Stevens) ("Congress intended that the exemption would allow a Native corporation to offset the income of a non-Native corporation profitable

subsidiary with its [NOLs] and share the resulting tax benefits with the Native corporation."); *Chugach Alaska Corp. v. United States*, 34 F.3d 1462, 1464 (9th Cir.1994); *Doyon*, 37 Fed.Cl. at 13 & n. 7.

**6.** Pub.L. No. 99–514, § 1804(e)(4), 100 Stat. 2085, 2801 (1986). Section 1804(e)(4) amended DEFRA § 60(b)(5) so as to clarify that the IRS would not be permitted to frustrate sales of tax benefits by ANCs by using anti-abuse measures in the Code, *i.e.*, I.R.C. §§ 269, 482, or judicially created principles such as the assignment of income doctrine. *See Doyon*, 37 Fed.Cl. at 25–26.

**7.** Pub.L. No. 100–647, § 5021, 102 Stat. 3342, 3666 (1988). TAMRA § 5021 repealed the DEFRA § 60(b)(5) exemption, but grandfathered existing contracts so as to permit a maximum of $40 million of taxable income to be sheltered by ANC NOLs pursuant to each such grandfathered contract. *See Doyon*, 37 Fed.Cl. at 13 & n. 9.

(which included Corp. VII) for its taxable year ended October 31, 1988.

In consideration for the *sale* of Doyon's NOLs to shelter the foregoing $40 million of Hilton's gross income from taxation, Doyon, Hilton, and Corp. VII agreed that Corp. VII was required to pay Doyon an amount equal to 35% of each dollar of taxable income transferred to Corp. VII, *i.e.*, tax attributes sold by Doyon, or a total of $14 million (35% × $40 million). *Doyon*, 37 Fed.Cl. at 15. Of said $14 million in consideration, $8,400,000 of this sum was paid to Doyon by wire transfer on December 18, 1987. The balance of the amount due to Doyon was paid by Corp. VII's issuance of a promissory note, dated December 18, 1987, and guaranteed by Hilton, in the amount of $5,600,000. According to the terms of said note, all accrued but unpaid principal and interest became due and payable upon the closing of Doyon's taxable year ended October 31, 1988, for federal income tax audit and assessment purposes. *Doyon*, 37 Fed.Cl. at 15.

### 2. *Hilton II Transaction*

The Hilton II transaction was structured in substantially the same manner as the Hilton I transaction. Doyon and Hilton entered into an agreement on April 29, 1988, pursuant to which Doyon acquired 100 shares of the Class A common stock of HILA Corp. I (Corp. I), another newly formed Nevada subsidiary of Hilton. Again, the purpose of the foregoing stock purchase was purely a transitory affiliation of Corp. I and Doyon solely and exclusively for effectuating consolidated tax return qualification, during which Corp. I would recognize gross income assigned to it by Hilton. *Doyon*, 37 Fed.Cl. at 15. By this mechanism, gross income in an amount ultimately determined to be $40 million was thereafter generated through Hilton and recognized by Corp. I and included in Doyon's consolidated taxable income for its taxable year ended October 31, 1988.[8] Corp. I's affiliation with Doyon terminated when Hilton repurchased the stock of Corp. I from Doyon for $101 on June 15, 1988.

Doyon, Hilton, and Corp. I further agreed that Corp. I was required to pay Doyon an amount equal to 28% of each dollar of taxable income transferred to Corp. I, *i.e.*, tax attributes *sold* by Doyon, or a total of $11.2 million, by the issuance of a promissory note payable to Doyon. *Doyon*, 37 Fed.Cl. at 16. Said note, like the promissory note issued in the Hilton I transaction, was *guaranteed* by Hilton, which conditioned the final payment of all principal and interest due thereunder upon the closing of Doyon's taxable year ended October 31, 1988, for federal income tax audit and assessment purposes. However, unlike the note issued in the Hilton I transaction, Corp. I's note was not issued contemporaneously with Corp. I's temporary affiliation with Doyon. Rather, Corp. I did not issue its $11.2 million note payable to Doyon until August 7, 1989, over a year after Corp. I's affiliation with Doyon had ended.[9]

### C. *Events Subsequent To Doyon's Taxable Year Ended October 31, 1988*

In July of 1989, Doyon filed its consolidated federal income tax return for the taxable

---

8. As originally conceived, the transaction called for Hilton to assign $45,454,455 of gross income to Corp. I. By agreement dated August 7, 1989, Doyon and Hilton (acting as the successor in interest to Corp. I as well as on its own behalf) amended their original agreement to provide that only $40 million of gross income would be includable in Doyon's consolidated tax return by virtue of its affiliation with Corp. I. Pursuant to a Closing Agreement entered into on or about June 16, 1992, Doyon and the IRS likewise agreed to reduce the amount of gross income recognized by Corp. I to $40 million so as to bring the Hilton II transaction into compliance with the grandfather rule of TAMRA § 5021(b)(2), note 7 *supra*. *Doyon*, 37 Fed.Cl. at 15 & n. 23.

9. Nothing in the record suggests that Corp. I issued its note *prior* to August 7, 1989. Although the original transaction documents executed on April 29, 1988, had a note appended thereto, said note bears no signature. Moreover, Doyon's and Hilton's agreement dated August 7, 1989, refers to Corp. I's note as an executory transaction, *i.e.*, the note "*which was to be issued* based on $45 million of benefit to Hilton." JX 4 at 574 (emphasis added). The delay in the issuance of Corp. I's note may have been attributable, at least in part, to the pending enactment of TAMRA, since the purpose of the August 7, 1989 agreement was to reduce the amount of said note to $11.2 million, *i.e.*, 28% of the $40 million transactional ceiling for grandfathering pursuant to TAMRA § 5021(b)(2).

year ended October 31, 1988. Due to the substantial NOL carryover from its taxable year ended October 31, 1987, Doyon and its affiliates incurred no regular corporate income tax liability for the taxable year ended October 31, 1988. However, for such year, Doyon reported alternative minimum tax (AMT) and environmental tax liabilities in the amounts of $1,858,473 and $109,108, respectively, and timely paid said taxes. *Doyon*, 37 Fed.Cl. at 16. Thereafter, upon an audit of Doyon's consolidated tax returns for the taxable years ended October 31, 1987, 1988, 1989, and 1990, the IRS increased Doyon's consolidated ANBI for the taxable year ended October 31, 1988, by the amount of the Disputed Sum, calculated as follows:

| Income realized from "sales" of tax benefits: | |
|---|---|
| Campbell transaction | $39,000,000 |
| Marriott transaction | 1,356,093 |
| Hilton I and Hilton II transactions | 25,200,000 |
| Financial statement tax benefit for reversal of prior year federal tax accruals | 4,950,000 |
| Total Disputed Sum | $70,506,093. |

*Doyon*, 37 Fed.Cl. at 16–17. As a consequence of this adjustment and certain other adjustments not contested here, Doyon's AMT and environmental tax liabilities for the taxable year in question were increased to $2,476,201 and $146,260, respectively, pursuant to a Closing Agreement entered into by Doyon and the IRS on or about June 16, 1992. Doyon paid the aforesaid additional taxes. Following the execution of this Closing Agreement, Hilton caused the amounts then due under the promissory notes issued by Corp. VII and Corp. I to be paid to Doyon by wire transfer effective July 31, 1992.[10]

10. The funds so transferred by Hilton totaled $25,100,405.74, consisting of $5,600,000 principal and $2,940,159.66 interest then due on Corp. VII's note, and $11,200,000 principal and $5,360,246.08 interest then due on Corp. I's note.

11. Doyon stated the foregoing two claims in the alternative because the $70,506,093 Disputed Sum is inclusive of the $25,200,000 consideration stemming from the Hilton I and Hilton II sales transactions. Thus, had Doyon been granted partial summary judgment on its first cause of action, Doyon's second alternative refund claim would, of course, have been moot.

On or about August 28, 1992, Doyon filed an amended consolidated income tax return for its taxable year ended October 31, 1988. Therein, Doyon asserted two alternative refund claims relevant here, corresponding to Doyon's first and second causes of action here at bar. Doyon's first alternative cause of action sought a tax refund of $746,942 on the ground that the IRS had improperly included the $70,506,093 Disputed Sum in Doyon's consolidated ANBI. In granting partial summary judgment for defendant with respect to Doyon's first cause of action, we sustained the Commissioner's inclusion of the Disputed Sum in Doyon's consolidated ANBI. *Doyon*, 37 Fed.Cl. at 25, 27–28. Doyon's second alternative cause of action, now pending before the court, after a trial on the merits, seeks a tax refund of $319,409 on the ground that the Commissioner incorrectly failed to eliminate from Doyon's consolidated ANBI the $25.2 million in consideration owed to Doyon by Corp. VII and Corp. I as a result of the sales of Doyon's tax attributes.[11] At trial, the litigants averred, respectively, somewhat intricate accounts of the manner in which Doyon's consolidated ANBI should reflect the Hilton I and Hilton II transactions. Given the foregoing, and in order to address the parties' conflicting positions from the clearest possible perspective, the court will first explicate the applicable Code provisions and Treasury Regulations that govern the determination of Doyon's AMT liability, as to which the computation of ANBI assumes pivotal importance at bar.

## STATUTORY BACKGROUND

In enacting the corporate AMT as part of the Tax Reform Act of 1986, Congress

As to Doyon's second alternative theory of recovery, its administrative claim for refund also sought the elimination of $4,950,000 of federal income tax benefits recorded for financial reporting purposes from consolidated ANBI. Thus, the $319,409 Doyon seeks is premised, according to its administrative refund claim, upon the elimination of this $4,950,000 item from ANBI. However, by the time its refund suit was initiated, Doyon had abandoned its position concerning this $4,950,000 item, leaving *only* the $25.2 million tax attributes sales consideration obligations at issue. Consequently, were Doyon to prevail with respect to its second cause of action, a recomputation of the refund due to Doyon would be required.

sought "a more effective means of collecting taxes from corporate taxpayers with significant *financial* profits who were escaping tax liability through tax preferences, deductions, or incentives." *CSX Corp. v. United States,* 124 F.3d 643, 644 (4th Cir.1997) (emphasis added) (citing, *inter alia,* S.Rep. No. 99–313, 99th Cong., 2d Sess., at 518–19 (1986); Staff of the Joint Committee on Taxation, *General Explanation of the Tax Reform Act of 1986* at 434 (1987)). In such cases, corporations pay the *greater* of the regular income tax imposed by § 11 or the AMT imposed by § 55. The AMT differs from the regular tax insofar as it is calculated upon alternative minimum taxable income (AMTI), which is taxable income adjusted pursuant to §§ 56 and 58, and increased by the items of tax preference listed in § 57. § 55(b)(2). By virtue of the aforesaid provisions, AMTI is a more broadly defined income tax base than regular taxable income, and it seeks to better measure a corporation's true economic income or gain. *CSX,* 124 F.3d at 644; *Doyon,* 37 Fed.Cl. at 19.

During Doyon's taxable year ended October 31, 1988, one of the adjustments required pursuant to § 56 was the so-called "book income" adjustment:

(f) Adjustments for book income of corporations.

(1) In general—The alternative minimum taxable income [AMTI] of any corporation for any taxable year beginning in 1987, 1988, or 1989 shall be increased by 50 percent of the amount (if any) by which—

(A) the adjusted net book income [ANBI] of the corporation, exceeds

(B) the alternative minimum taxable income for the taxable year (determined without regard to this subsection and

the alternative tax net operating loss deduction).

(2) Adjusted net book income.

For purposes of this subsection—

(A) In general—The term "adjusted net book income" means the net income or loss of the taxpayer set forth on the taxpayer's applicable financial statement, adjusted as provided in this paragraph.

(B) Adjustments for certain taxes—The amount determined under subparagraph (A) shall be appropriately adjusted to disregard any Federal income taxes ... which are directly or indirectly taken into account on the taxpayer's applicable financial statement....

(C) Special rules for related corporations.

(i) Consolidated returns—If the taxpayer files a consolidated return for any taxable year, adjusted net book income for such taxable year shall take into account items on the taxpayer's applicable financial statement which are properly allocable to members of such group included on such return.

§ 56(f)(1), (f)(2)(A), (f)(2)(B), (f)(2)(C)(i).[12] In short, to the extent that Doyon's consolidated ANBI exceeds its consolidated AMTI computed without regard to the book income adjustment, Doyon's consolidated AMTI is increased by one-half of said excess.[13] Ordinarily, Doyon's consolidated ANBI for its taxable year ended October 31, 1988, would equal its net income before income taxes, as reflected in its "applicable financial statement" *i.e.,* Doyon's audited consolidated income statement for its year ended October 31, 1988.[14] However, for the sake of consis-

**12.** Effective for taxable years beginning after 1989, § 56(f) was repealed and replaced by § 56(g), which provides for an adjustment to AMTI based upon "adjusted current earnings." Pub.L. No. 101–508, §§ 11801(a)(3), 11801(c)(2)(A), 104 Stat. 1388 (1990).

**13.** Section 59A imposes upon corporations an environmental tax at a rate equal to 0.12% of AMTI, after certain modifications, to the extent that AMTI so modified exceeds $2 million. § 59A(a). Thus, a change in ANBI that increases or decreases AMTI generally causes a corre-

sponding increase or decrease in the environmental tax liability.

**14.** Setting out a hierarchy of financial statements which qualify as candidates for the "applicable financial statement," § 56(f)(3) lists the following in order of preference: (i) a financial statement required to be filed with the Securities and Exchange Commission; (ii) a certified audited income statement used for credit purposes, reporting to shareholders, or another substantial nontax purpose; (iii) an income statements for a substantial nontax purpose required to be filed

tency, Doyon's consolidated ANBI must properly take into account the ANBI of each corporation which joined in the filing of its consolidated tax return for the year ended October 31, 1988. § 56(f)(2)(C)(i); Treas. Reg. § 1.56–1(d)(6)(i)(A). Although Doyon's applicable financial statement includes three wholly-owned subsidiaries and an interest in a joint venture, it excludes two other subsidiaries—Corp. VII and Corp. I—that were included in Doyon's consolidated return. In such circumstances, the pertinent Treasury Regulation provides that:

> Consolidated net book income reported on the applicable financial statement (as determined under paragraph (c)(5) of this section) shall be adjusted to include net book income attributable to a corporation that is included in the consolidated group [for tax return purposes] but is not included in the applicable financial statement. Net book income of the corporation not included in the applicable financial statement of the consolidated group is the net book income reported on such corporation's applicable financial statement (determined under the rules of paragraph (c) of this section and adjusted under the rules of this paragraph (d)). The adjusted net book income of such corporation must be consolidated with the adjusted net book income of other members of the consolidated group and *appropriate adjustments, including consolidating elimination entries, must be made.*

Treas. Reg. § 1.56–1(d)(6)(i)(B)(1) (emphasis added). Pursuant to the foregoing provision, the separate company ANBI of Corp. VII

and Corp. I must be consolidated with the ANBI of Doyon and its other subsidiaries. Since neither Corp. VII nor Corp. I had an "applicable financial statement," each firm's separate company ANBI equals its earnings and profits,[15] before income taxes, for the year ended October 31, 1988. § 56(f)(3)(B). Consequently, Doyon's consolidated ANBI for its taxable year ended October 31, 1988, equals the sum of (i) Doyon's net income before income taxes, as reflected in its audited consolidated income statement, (ii) Corp. VII's earnings and profits, and (iii) Corp. I's earnings and profits, modified by "appropriate adjustments, including consolidating elimination entries," if any. Treas. Reg. § 1.56–1(d)(i)(B)(1). For present purposes, it is undisputed that Doyon's consolidated ANBI, computed without regard to any consolidating elimination entries, was $159,723,-568, as follows:

| | |
|---|---|
| Doyon net income before income taxes, per audited consolidated income statement | $ 79,723,568 |
| Corp. VII earnings and profits, before income taxes | 40,000,000 |
| Corp. I earnings and profits, before income taxes | 40,000,000 |
| Consolidated ANBI | $159,723,568. |

Appendices A and B–1, attached hereto, illustrate the mechanics of this calculation. Here at bar, the dispositive question for decision, therefore, is whether Doyon is entitled to reduce its consolidated ANBI by a consolidating elimination entry in the amount of $25,200,000, consisting of the consideration allegedly owed to Doyon by Corp. VII and Corp. I, and ultimately paid by Hilton, stemming solely from the sales of tax attributes.

with Federal, state, or local authorities; or (iv) an unaudited income statement used for credit purposes, reporting to shareholders, another substantial nontax purpose. Doyon's audited consolidated income statement falls in the second of the aforesaid four categories of applicable financial statement.

**15.** The Code and Treasury Regulations contain many references to the term "earnings and profits." *See, e.g.,* § 312 (describing how various transactions influence computation of earnings and profits); Treas. Reg. § 1.1502–33 (same as to earnings and profits of corporations filing consolidated income tax returns). However, "[i]t is a curious fact that the Code, ordinarily so prodigal in the use of words, does not specifically

define the phrase 'earnings and profits.' ... The phrase entered the federal tax law in 1916, but ... a comprehensive definition is still lacking." Boris I. Bittker and James S. Eustice, *Federal Income Taxation Of Corporations And Shareholders* ¶ 7.03, at 7–9 to 7–10 (5th ed.1987). In essence, earnings and profits are the measure of a corporation's capacity to pay taxable dividends to its shareholders. *See* § 316(a) (term "dividend" defined by reference to earnings and profits). Like ANBI, earnings and profits are a broader measure of economic income than regular taxable income. *See, e.g.,* § 312(n) (listing certain income tax deductions disregarded in computing earnings and profits); Treas. Reg. § 1.312–6(b) (providing that items of income otherwise exempt from taxation nonetheless increase earnings and profits).

With respect to that issue, the respective positions of the parties follow.

## CONTENTIONS OF THE PARTIES

### A. *Plaintiff*

Doyon contends that, in computing its consolidated ANBI for the taxable year ended October 31, 1988, a consolidating elimination entry in the sum of $25.2 million must be recorded in order to avoid double counting the $25.2 million of sales proceeds realized from the two Doyon sales transactions to Hilton. Specifically, if the "applicable financial statements" of Doyon, Corp. VII, and Corp. I are simply combined without any consolidating elimination entry, Doyon asserts that the $25.2 million will be included in consolidated ANBI twice—(i) once as a component of the Disputed Sum reported on Doyon's audited income statement, and (ii) again within the $80 million of assigned income reflected in the earnings and profits of Corp. VII and Corp. I. Since the $25.2 million is unquestionably a part of the Disputed Sum, it follows that Doyon's averred position necessarily hinges upon the purported inclusion of the $25.2 million within the $80 million of assigned income. *Doyon*, 37 Fed.Cl. at 16–17.

As to whether Corp. VII and Corp. I were the *real* sources of the $25.2 million paid as consideration for the sales of the tax benefits, Doyon candidly admits that there is no probative evidence establishing that Hilton's payments of the $25.2 million were in fact routed through Corp. VII's and Corp. I's accounts prior to being paid over to Doyon. Doyon further acknowledges that Corp. VII and Corp. I, having been formed *solely* to effectuate the scheme by which Doyon's NOLs were sold and used to shelter $80 million of Hilton's income from taxation, lacked any independent economic substance.[16] Moreover, Doyon concedes that neither Corp. VII nor Corp. I maintained any

contemporaneous books and records from which one might definitively ascertain the origin of the $25.2 million in question.

Lacking probative accounting records, not to mention other indicia of economic substance, with respect to Corp. VII and Corp. I, Doyon's case, at best, rests upon a hypothetical application of generally accepted accounting principles (GAAP) to the Hilton transactions, as delineated in the contracts between Doyon, Hilton, Corp. VII, and Corp. I, solely for the purpose of constructing "applicable financial statements" for Corp. VII and Corp. I. Although GAAP would not ordinarily require the preparation of financial statements for sham corporations such as Corp. VII and Corp. I, Doyon observes that Treas. Reg. § 1.56–1(d)(6)(i)(B)(1) mandates that Corp. VII and Corp. I shall nevertheless be accounted for *as if* they had economic substance for purposes of determining consolidated ANBI. Additionally, Doyon avers that both Treas. Reg. § 1.56–1(d)(6)(b)(1) and GAAP require that consolidating elimination entries shall be made where appropriate. A consolidating elimination entry reducing its ANBI by $25.2 million is not only appropriate but required, Doyon contends, under § 56(f)(2)(J), which provides that under regulations, ANBI "shall be properly adjusted to prevent the omission or duplication of any item."

Further contending that the contracts underlying the Hilton I and Hilton II transactions are definitive, Doyon also argues that said contracts affirmatively obligated Corp. VII and Corp. I to pay Doyon the $25.2 million consideration out of the income assigned to them by Hilton. Therefore, reasons Doyon, the $25.2 million necessarily must be a part of the $80 million of assigned income recognized by Corp. VII and Corp. I. Thus, once the "applicable financial statements" of Doyon, Corp. VII, and Corp. I are combined, Doyon argues, the inclusion of the

---

**16.** Hilton capitalized Corp. VII with only a $1,000 cash capital contribution and a Hilton promissory note in the sum of $9,453,509,454. Similarly, Hilton capitalized Corp. I with only $1,000 cash and another promissory note in the principal amount of $45,000,000. In addition to being nominally capitalized, both Corp. VII and Corp. I were precluded by their articles of incor-

poration from conducting *any* business other than facilitating the intended transfer of tax benefits from Doyon to Hilton. This irrefutable factual circumstance is further corroborative of the fact that it was Hilton to whom Doyon looked for, and from whom Doyon received, payment of the $25.2 million consideration for the sale of Doyon's tax attributes.

$25.2 million in the $80 million of assigned income recognized by Corp. VII and Corp. I inescapably duplicates the $25.2 million which is also recorded by Doyon as part of the Disputed Sum. At trial, Doyon sought to demonstrate the aforesaid alleged double counting with a simple (albeit factually inapposite) example, summarized as follows:

> Assume that Hilton had assigned $80 million of taxable income to a subsidiary called "HILA" and at the same time transferred cash to HILA in like amount; that HILA was then sold for nominal consideration to Doyon; that HILA and Doyon agreed that Doyon would include the $80 million of taxable income in its taxable income; that HILA would pay Doyon $25.2 million in consideration for that tax sheltering arrangement; and that thereafter HILA (with the remaining $54.8 million in cash) was sold back to Hilton for nominal consideration.

Plaintiff's Post–Trial Proposed Findings Of Fact And Conclusions Of Law (PPF), filed December 22, 1997, at 23, ¶ 65 (citing JX 31; Tr. 136–37). Doyon asserts that, in the foregoing hypothetical, the $80 million of assigned income is plainly the source of the $25.2 million tax sharing payment to Doyon.

One, of course, must observe that the real Hilton I and Hilton II transactions differ from the foregoing hypothetical in two minor respects, according to Doyon. First, Hilton made no up-front cash transfer in the sum of $80 million to Corp. VII and Corp. I (thus, Corp. VII and Corp. I did not have the ability to pay the $25.2 million). Second, only $8.4 million of the $25.2 million tax sharing obligation was paid in cash to Doyon *by Hilton* during its brief periods of affiliation with Corp. VII and Corp. I, with the remainder being paid *by Hilton* well after

Corp. VII and Corp. I had disaffiliated from Doyon. In short, apart from the aforesaid $8.4 million cash payment, the obligations of Hilton, Corp. VII, and Corp. I arising from the transactions at issue had not progressed beyond executory contractual promises of payment insofar as Doyon's taxable year ended October 31, 1988, is concerned. Under the customary accrual method of accounting, Doyon contends, such executory promises have sufficient economic substance to warrant recognition in the applicable financial statements of Corp. VII and Corp. I.[17]

Doyon vehemently argues that Corp. VII and Corp. I cannot be disregarded for want of economic substance, so as to sever the $25.2 million tax sharing payment from its alleged source, the $80 million of assigned income, and thereby attribute this obligation to Hilton. There is, Doyon pointedly submits, nothing in the record suggesting there was a separate and distinct contractual obligation on Hilton's part to pay $25.2 million directly to Doyon, in addition to Hilton's obligation to assign $80 million of income to Corp. VII and Corp. I. According to Doyon, Corp. VII and Corp. I were the immediate obligors with respect to the $25.2 million, whereas Hilton merely stood as a guarantor that was secondarily liable with respect to this sum. Doyon further contends that the proper accounting treatment of the $25.2 million was fixed by reference to the legal rights and obligations of Corp. VII and Corp. I as of the time the pertinent contracts were originally entered into, and that said accounting treatment, once established, should not retroactively change due to *Hilton's ultimate payment,* as guarantor, *of the entire amounts owed to Doyon* by Corp. VII and Corp. I. Moreover, Doyon reasons that:

---

17. The results of recognizing the Hilton I and Hilton II transactions in the applicable financial statements of Corp. VII and Corp. I, in accordance with Doyon's position, are depicted in App. A, *infra.* For illustrative purposes, Doyon proffers a set of accounting journal entries that purport to be the entries Corp. VII and Corp. I would have recorded, had they maintained contemporaneous books and records, in order to accrue the $80 million of assigned income and the $25.2 million of sales proceeds obligations. Since the foregoing journal entries were *not* in

fact made, they, of course, are unquestionably *not* probative of any fact in issue inasmuch as they are, in essence, speculative. To assign probative weight to such unrecorded accounting journal entries would violate the maxim that, for federal income tax purposes, "a transaction is to be given effect in accord with *what actually occurred* and *not* in accord with *what might have occurred." Commissioner v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 148, 94 S.Ct. 2129, 40 L.Ed.2d 717 (1974) (emphasis added).

Congress chose to permit ANCs to transfer the benefit of their tax attributes to other corporations by (a) relaxing an otherwise applicable prohibition on filing consolidated tax returns that included shell corporations and (b) permitting assignments of taxable income to such shell corporations in circumstances that would otherwise be permitted....

\* \* \* \* \* \*

No provision of the federal income tax law would have permitted Doyon to shelter $80 million of Hilton's taxable income except through the mechanism of a consolidated return filing of the type implemented, using companies like [Corp. VII and Corp. I] as integral parts of the mechanism. Specifically, a simple agreement between Doyon and Hilton under which Doyon [sic] directly assigned taxable income of $80 million (never to be paid in cash) to Doyon and agreed to pay an additional cash amount of $25.2 million would have been completely ineffective to transfer Doyon's tax benefits to Hilton.

PPF at 27–28, ¶¶ 71, 73. Finally, Doyon objects to the seeming incongruity of treating Corp. VII and Corp. I as if they had economic substance so as to compel the recognition of $80 million of assigned income, while at the same time dismissing them for want of economic substance where their $25.2 million of sales proceeds obligations are concerned.

### B. *Defendant*

Defendant, in response, emphatically assails Corp. VII and Corp. I for their total lack of economic substance, characterizing these entities as mere "conduits for the transfer of tax attributes" that had no existence for financial accounting purposes. Defendant's Proposed Findings of Fact and Conclusions Of Law, filed December 19, 1997, at 12, ¶ 52. Given the averred want of substance of Corp. VII and Corp. I, defendant maintains that Doyon did not realize $25.2 million of consideration proceeds pri-

marily from pure intercompany sales transactions with these companies. *Id.* Adamantly denying that Corp. VII and Corp. I had binding legal obligations to pay $25.2 million to Doyon, defendant emphasizes that the Hilton I and Hilton II transactions were knowingly and intentionally structured such that Corp. VII and Corp. I possessed absolutely no means whatsoever of paying their putative sales price consideration to Doyon. Because it was an absolute certainty, in defendant's view, that Hilton—a corporation unaffiliated with Doyon—would (and did) in fact pay the $25.2 million to Doyon, it is irrefutable, on this record, that no portion of the $25.2 million originated in an intercompany transaction. Rather, defendant warmly contends, the $25.2 million flowed directly from Hilton to Doyon as proceeds from Doyon's *sale* of future tax benefits to Hilton, *i.e.*, a component of the Disputed Sum on Doyon's income statement.[18] Insofar as no intercompany transaction caused the inclusion of this $25.2 million in the Disputed Sum, or in the $80 million of assigned income, concludes defendant, there is no demonstrable requirement that Doyon's consolidated ANBI be reduced by a consolidating elimination entry of like amount.

Questions of economic substance aside, defendant further contends that Doyon has totally failed to carry its burden of proving that the $25.2 million, at issue, will be double counted unless a consolidating elimination entry, *i.e.*, a debit in the amount of $25.2 million, is made to reduce Doyon's consolidated ANBI. In short, even assuming Corp. VII and Corp. I incurred intercompany sales proceeds obligations in the sum of $25.2 million, avers defendant, the record contains *zero* proof that the $25.2 million was included in the $80 million of assigned income realized by Corp. VII and Corp. I.

### DISCUSSION

 In every tax refund suit, the taxpayer carries the heavy burden of overcom-

---

18. Even assuming that the $25.2 million momentarily passed through Corp. VII and Corp. I, via an agency theory, on its way from Hilton to Doyon, defendant insists the result would be unchanged—that is, in terms of economic substance, the reality of the transactions would continue to run directly between Hilton and Doyon. As further noted herein, *infra*, such hypothetical scenarios are, at best, hospitable window dressing and void of any probative value.

ing the presumption that the Commissioner's determinations are correct as a matter of law. *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933); *Transamerica Corp. v. United States,* 902 F.2d 1540, 1543 (Fed.Cir.1990). As a consequence, Doyon must go forward with sufficient probative evidence to support a finding contrary to the Commissioner's determination. *Danville Plywood Corp. v. United States,* 899 F.2d 3, 7 (Fed.Cir.1990). More importantly, Doyon must carry the ultimate burden of affirmatively establishing each operative element of its claim by a preponderance of the evidence. *Transamerica,* 902 F.2d at 1543; *Tucker v. United States,* 8 Cl.Ct. 180, 186 (1985).

At the outset, we note the somewhat unorthodox nature of Doyon's proof. In that connection, Doyon's factual proof, at trial, consisted entirely of documentary evidence, *i.e.,* the Doyon–Hilton contracts, tax returns, and other pertinent papers, as well as a fairly extensive stipulation of facts jointly entered into by the parties. Yet, as to the central issue here in dispute—the proper accounting treatment of the $25.2 million of purported intercompany sales proceeds obligations, for purposes of determining Doyon's ANBI— Doyon knowingly and admittedly furnished no contemporaneous books and records for Corp. VII and Corp. I, and, moreover, failed to produce its own internal accounting records relating to the Hilton transactions. Nor did Doyon present any factual eyewitness testimony respecting the intended operation of the tax sharing arrangements to which Doyon, Hilton, Corp. VII, and Corp. I were parties. Instead, Doyon relies entirely upon the *post hoc* opinions of its accounting expert, Mr. John Little,[19] concerning the proper accounting treatment of the Hilton transactions pursuant to GAAP.

Doyon's expert's opinion testimony in financial accounting theory would, on this record, ordinarily be entitled to marginal probative weight in its own right. Indeed, this is particularly true in a routine income tax refund case where the utter absence of

*any* books and records relating to the operative transactions in question would be automatically fatal, given the Commissioner's presumption of correctness. Moreover, it is well settled that conformity with GAAP does not necessarily guarantee that an accounting method provides a clear reflection of income under the federal income tax laws, "in light of the vastly different objectives that financial and tax accounting have." *Thor Power Tool Co. v. Commissioner,* 439 U.S. 522, 542, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979). As the Supreme Court has explained:

> The primary goal of financial accounting is to provide useful information to management, shareholders, creditors, and others properly interested; the major responsibility of the accountant is to prevent these parties from being misled. The primary goal of the income tax system, in contrast, is the equitable collection of revenue; the major responsibility of the Internal Revenue Service is to protect the public fisc.... Given this diversity, even contrariety, of objectives, any presumptive equivalency between tax and financial accounting would be unacceptable.

*Id.* at 542–43, 99 S.Ct. 773; *see also id.* at 544, 99 S.Ct. 773 ("[A] presumptive equivalency between tax and financial accounting would create insurmountable difficulties of tax administration."); *Frank Lyon Co. v. United States,* 435 U.S. 561, 577, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978) ("[T]he characterization of a transaction for financial accounting purposes, on the one hand, and for tax purposes, on the other, need not necessarily be the same.... Accounting methods or descriptions, without more, do not lend substance to that which has no substance.") (citations omitted); *Iowa Southern Util. Co. v. United States,* 841 F.2d 1108, 1111–12 (Fed.Cir.1988) (to same effect). Stated differently, GAAP does not constitute legal authority for the propriety of a given accounting method; rather, GAAP is merely a nondispositive statement of customary accounting practices. We are also mindful that the opinions of accounting experts, as

---

**19.** Mr. Little is a certified public accountant (CPA) and a retired partner in the accounting firm of Ernst & Young.

with the opinions of experts in other fields of knowledge, are not conclusive and binding upon the court sitting as a trier of fact. *Dayton Power & Light Co. v. Public Utilities Commission,* 292 U.S. 290, 299, 54 S.Ct. 647, 78 L.Ed. 1267 (1934); *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627–29, 64 S.Ct. 724, 88 L.Ed. 967 (1944); *Sternberger v. United States,* 185 Ct.Cl. 528, 535–36, 401 F.2d 1012 (1968) (*per curiam*) ("Even uncontradicted opinion testimony is not conclusive if it is intrinsically nonpersuasive."); *Mims v. United States,* 375 F.2d 135, 140 & n. 2 (5th Cir.1967).

Notwithstanding the foregoing considerations, we agree with Doyon, nevertheless, that § 56(f)(3) and Treas. Reg. § 1.56–1(d)(6)(i)(B)(1) compel the court to tread the realm of financial accounting theory in order to resolve this controversy. Section 56(f)(3)(B) expressly acknowledges that some corporations, *i.e.,* Corp. VII and Corp. I, prepare no contemporaneous "applicable financial statement," and directs that earnings and profits shall be used in such cases. Treas. Reg. § 1.56–1(d)(6)(i)(B)(1) extends this principle to corporations, *i.e.,* Corp. VII and Corp. I, that are included in a consolidated group for tax return purposes but are not included in the "applicable financial statement" of the parent corporation of said group, *i.e.,* Doyon. Moreover, § 1.56–1(d)(6)(i)(B)(1) commands that "appropriate adjustments, including consolidating elimination entries, must be made" in such cases in order to ensure that intercompany transactions do not distort consolidated ANBI. The foregoing regulatory directive is unaccompanied, however, by any dispositive guidance as to the circumstances in which a consolidating elimination entry is appropriately made. Indeed, the permissible circumstances of a "consolidating elimination entry" are foreign not only to the structure of the Code itself, but also to the other source where one would most expect to find guidance—the voluminous Treasury Regulations, promulgated pursuant to the grant of authority in § 1502, that govern the filing of consolidated tax returns. *See* Treas. Reg. § 1.1502–13(b)(1) (1988) ("Gain or loss on intercompany transactions ... shall not be ... eliminated."); Fred W. Peel, Jr. et al., *Consolidated Tax Returns* § 6:03, at 10 (3d ed. rev.1997) ("[I]ntercompany transactions ... are not eliminated, even if the combined effect on the two parties to a transaction is a wash.").[20] Accordingly, lacking other sources of guidance as to the circumstances in which a consolidating elimination entry is properly made, the court has little choice but to consider the hypothetical application of GAAP, as interpreted by the parties' expert accounting witnesses—Mr. Little for Doyon and Professor Phillip Buchanan on the Government's behalf[21]—to the transactions at issue.

Against this background, therefore, the merits of Doyon's claim turn upon two questions. First, as a threshold matter, must the $25.2 million of intercompany tax attribute sales proceeds obligations *allegedly* incurred by Corp. VII and Corp. I be given effect for purposes of calculating their respective separate-company ANBIs for the taxable year

---

**20.** Intercompany dividends are the exception, not pertinent here, to this general prohibition on the elimination of intercompany transactions. *See* Treas. Reg. §§ 1.1502–13(a)(1)(ii) (1988) (defining the term "intercompany transaction" to exclude intercompany dividends) and 1.1502–14(a)(1) (1988) (providing that intercompany dividends shall be eliminated). Apart from the foregoing exception for intercompany dividends, however, intercompany transactions are not eliminated for purposes of consolidated tax return filings. Rather, intercompany transactions are either recognized immediately and fully by each party to the transaction or, in certain cases, *deferred* pending the occurrence of certain specified future events. See Treas. Reg. §§ 1.1502–1013(b)(1), (c) (1988); *International Paper Co. v. United States,* 33 Fed.Cl. 384, 403–04 (1995).

**21.** Professor Buchanan, also a CPA, is an Associate Professor of Accounting at George Mason University in Fairfax, Virginia. Both experts blandly opined that there is nothing inherently illegitimate about the *post hoc* creation of financial statements for shell corporations like Corp. VII and Corp. I, so long as the resulting financial statements are in accordance with GAAP and reflect the substance of the pertinent transactions. With all due deference to the assurances of the parties' experts, the court is constrained to observe that financial statements created years after the fact are unquestionably entitled to far less probative weight, if any, than financial statements prepared contemporaneously with the transactions reflected therein.

ended October 31, 1988?[22] If so, is a consolidating elimination entry required in order to avoid duplication of the aforesaid $25.2 million within Doyon's consolidated ANBI? Although we answer the threshold question in the affirmative, as to the second question we must respond in the negative inasmuch as the court finds that Doyon's allegations of double counting have not been and cannot be proven on this record. We address these matters *seriatim.*

## A. *Existence Of Intercompany Tax Attribute Sales Proceeds Obligations*

 Regarding the threshold question of whether Corp. VII and Corp. I incurred intercompany tax attribute sales proceeds obligations, payable to Doyon, in the sum of $25.2 million, several undisputed facts operate in concert to resolve this question in the affirmative. First, neither Corp. VII nor Corp. I prepared applicable financial statements within the meaning of § 56(f)(3)(A) for the year ended October 31, 1988. Second, Corp. VII and Corp. I were included, albeit only briefly, in Doyon's consolidated tax return for the taxable year ended October 31, 1988. Third, while affiliated with Doyon for consolidated tax return purposes, Corp. VII and Corp. I each recognized $40 million of taxable income through an assignment from Hilton of an equal amount of earnings and profits (before income taxes). Fourth, on or about June 13, 1988, the Internal Revenue Service granted Doyon permission to allocate its consolidated federal tax liability, pursuant to the method described in Treas. Reg. § 1.1502–33(d)(2)(ii), among the members joining in Doyon's consolidated tax return. Said allocation method was effective for Doyon's taxable year ended October 31, 1987,

and was made binding for all subsequent tax years unless the Service granted permission to change to another method. From these indisputable facts, the conclusion is inescapable, as a matter of law, that Corp. VII and Corp. I recognized *substantial* intercompany obligations and benefits, for purposes of determining their respective separate-company ANBIs, by virtue of their participation in the contractual arrangements by which Doyon sold its tax attributes to Hilton.

In reaching this conclusion, we begin with § 56(f)(3), which provides that the ANBI of a corporation lacking an "applicable financial statement" equals said corporation's earnings and profits. As to the computation of earnings and profits by the members of an affiliated group of corporations filing a consolidated tax return, the Code provides:

> Pursuant to regulations prescribed by the Secretary the earnings and profits of each member of an affiliated group required to be included in a consolidated return for such group filed for a taxable year *shall be determined by allocating the tax liability of the group for such year among the members of the group* in accord with whichever of the following methods the group shall elect in its first consolidated return filed for such a taxable year:
>
> (1) The tax liability shall be apportioned among the members of the group in accordance with the ratio which that portion of the consolidated taxable income attributable to each member of the group having taxable income bears to the consolidated taxable income.
>
> . . . .
>
> [alternative allocation methods, not relevant here, omitted]

**22.** By way of explanation, if the $25.2 million of intercompany tax attribute sales proceeds obligations allegedly arising from the contractual arrangements at issue here are "given effect," such contractual arrangements shall be deemed significant or relevant to the court's determination of the separate-company ANBIs of Corp. VII and Corp. I, *i.e.,* Doyon's position. If, on the other hand, said $25.2 million item is not "given effect," then the underlying contractual arrangements shall be disregarded as ineffectual or irrelevant, *i.e.,* the Government's position.

The term "intercompany tax attribute sales proceeds obligations," used throughout the fol-

lowing discussion, accurately captures the essence of these alleged intercompany obligations, in view of their close—even inseparable—association with the $25.2 million receivable due Doyon, from Hilton, as consideration for the use of Doyon's NOL carryforwards in sheltering Hilton's taxable income. Of course, the foregoing $25.2 million of intercompany tax attribute sales proceeds obligations allegedly incurred by Corp. VII and Corp. I corresponds precisely with the $25.2 million of proceeds receivable by Doyon and reflected as a constituent of the Disputed Sum in Doyon's Annual Report.

§ 1552(a)(1) (emphasis added). *See generally* Peel, *supra,* §§ 17:04, 17:06. In addition to the method elected under § 1552, the group may also elect a complementary tax allocation method under Treas. Reg. § 1.1502–33(d). Treas. Reg. §§ 1.1552–1(c)(2), 1.1502–33(d)(3).[23] *See also* Treas. Reg. § 1.1502–12 (providing that the earnings and profits of each member of a consolidated group "shall be determined under § 1.1502–33");[24] Peel, *supra,* §§ 17:04, 17:07. Most importantly, and for present purposes, the pertinent regulations provide that the amount of the tax liability allocated to each member of the group "shall (i) result in a decrease in the earnings and profits of such corporation in such amount, and (ii) *be treated as a liability of such corporation for such amount.*" Treas. Reg. § 1.1552–1(b)(2) (1988) (emphasis added). *See also* Treas. Reg. § 1.1502–33(d)(1) (same consequences ensue from the application of the complementary tax allocation methods specified in § 1.1502–33(d)); Peel, *supra,* § 17:05, at 11.

Since *separate* company ANBI is determined by reference to earnings and profits in the case of Corp. VII and Corp. I, pursuant to § 56(f)(3), the determination of Doyon's consolidated ANBI cannot disregard allocated intercompany tax liabilities created pursuant to the consolidated tax return rules which govern the computation of earnings and profits. Therefore, we hold that Corp. VII and Corp. I each incurred an allocated intercompany tax liability in an amount determined pursuant to §§ 1.1552–1(a)(1) and 1.1502–33(d)(2)(ii).[25] On this record, Corp. VII and Corp. I incurred *no* allocated tax liability pursuant to § 1.1552–1(a)(1), inasmuch as that provision does not permit the intercompany allocation of an amount exceeding the total consolidated tax liability, which is zero in this case due to Doyon's substantial NOL carryforwards. § 1.1552–1(a)(1)(ii); Peel, *supra,* § 17:06, at 14.[26]

In contrast, the complementary methods prescribed by Treas. Reg. § 1.1502–33(d) permit the allocation of tax liability to profitable members of the group even if the amounts so allocated exceed the consolidated tax liability. Treas. Reg. § 1.1502–33(d)(1). Stated differently, where the taxable income of a profitable member of the group is sheltered by the NOLs of another member, Treas. Reg. § 1.1502–33(d)(2)(ii) establishes a mechanism by which the profitable member may fully compensate the loss member for

**23.** Treas. Reg. § 1.1502–33, as in effect for the taxable year ended October 31, 1988, is appended hereto, in relevant part, as Appendix C, *infra.*

**24.** Where no election is made under § 1.1502–33(d)(3) for the first consolidated return year of the group, the Commissioner's approval is required if the group seeks to make such an election for a later taxable year. Treas. Reg. § 1.1502–33(d)(3)(ii). Nothing in the record suggests that Doyon thereafter sought to change its method of making intercompany allocations of its consolidated federal tax liability. Thus, the aforementioned method remained in effect for Doyon's taxable year ended October 31, 1988.

**25.** Our holding here is entirely consistent with our prior rejection of Doyon's argument that the Disputed Sum should be excluded from its consolidated ANBI pursuant to § 56(f)(2)(B), which provides that ANBI "shall be appropriately adjusted to disregard any Federal income taxes, . . . which are directly or indirectly taken into account on the taxpayer's applicable financial statement." In support of the central premise of its first cause of action—that the Disputed Sum constituted excludable "Federal income taxes"— Doyon argued, in part, that the transactions giv-

ing rise to the Disputed Sum were analogous to "intercompany payments by affiliates of their allocated tax expense." *Doyon,* 37 Fed.Cl. at 24. By rejecting Doyon's claim and granting partial summary judgment in defendant's favor, we held that, since the Disputed Sum represents Doyon's receipt of consideration pursuant to private sales contracts with an unaffiliated party, Hilton, as opposed to a tax rebate or refund from the Federal Government, the Disputed Sum is not "Federal income taxes" excludable under § 56(f)(2)(B). *Id.* at 23–24.

**26.** Under this method, "[t]he tax liability of the group shall be apportioned among the members of the group in accordance with the ratio which that portion of the consolidated taxable income attributable to *each member of the group having taxable income* bears to the consolidated taxable income." Treas. Reg. § 1.1552–1(a)(1)(i) (1988) (emphasis added). Corp. VII and Corp. I each reported $40 million of taxable income but, on the whole, Doyon's consolidated return for its taxable year ended October 31, 1988, as finally adjusted pursuant to the parties' Closing Agreement, reflects negative taxable income, *i.e.,* a substantial NOL carryforward. JX 14 at 1012, ¶ 24 ($27,370,791 of unabsorbed NOL remaining as of October 31, 1988).

the absorption of its NOLs, regardless of whether the group incurs any consolidated tax liability.[27] Peel, *supra*, § 17:07, at 21, 24. Indeed, the Commissioner expressly acknowledged this principle in granting Doyon permission to use the tax allocation method prescribed by Treas. Reg. § 1.1502–33(d)(2)(ii).

Based upon the foregoing, the court finds that, pursuant to Treas. Reg. § 1.1502–33(d)(2)(ii), for purposes of computing their respective earnings and profits (*i.e.*, separate-company ANBI) Corp. VII and Corp. I each incurred $13,600,000 (34% of $40 million) of allocated intercompany tax liability, payable to Doyon, representing $40 million of assigned income multiplied by the applicable 34% corporation income tax rate. § 11(b)(1) (1988). Our finding conclusively disposes of the Government's contention that for purposes of computing the separate-company ANBIs of Corp. VII and Corp. I, principles of financial accounting compel the court to disregard their $25.2 million of intercompany tax attribute sales proceeds obligations for want of economic substance. Irrespective of the economic substance of their *contractual* sales obligations, Corp. VII and Corp. I may plainly recognize $27.2 million of intercompany tax liabilities, *as a matter of law*, pursuant to Treas. Reg. § 1.1502–33(d)(2)(ii).[28]

The mere fact that Doyon, Corp. VII, and Corp. I agreed to contractually modify the amount of the intercompany tax attribute sales proceeds obligations, from $27.2 million to $25.2 million, does not invalidate the foregoing legal conclusion. On the contrary, this is so inasmuch as Treas. Reg. § 1.1502–33(d)(2)(ii), as a consolidated federal income tax return regulation, is legislative in nature and has the force and effect of law. *American Standard, Inc. v. United States*, 602 F.2d 256, 260, 220 Ct.Cl. 411, 416 (1979); *Coca-Cola Bottling Co. Of Baltimore v. United States*, 487 F.2d 528, 532, 203 Ct.Cl. 18, 26 (1973); *International Paper Co. v. United States*, 33 Fed.Cl. 384, 413 (1995). Consequently, Treas. Reg. § 1.1502–33(d)(2)(ii) cannot be nullified by private tax sharing/sales agreements. *See* Rev. Rul. 73–602, 1976–2 C.B. 257, 258; Peel, *supra*, § 17:05, at 10–11.[29] Whatever other tax consequences may arise from the private contractual arrangements for the sale of intangible personal property at issue here, *i.e.*, Doyon's tax attributes, Treas. Reg. § 1.1502–33(d)(2)(ii) nevertheless governs the allocation of intercompany tax liabilities for purposes of determining the earnings and profits of Corp. VII and Corp. I during the period of their inclusion within Doyon's consolidated income tax return.

Even assuming that Treas. Reg. § 1.1502–33(d)(2)(ii) were inapposite, the court is unpersuaded by defendant's contention that Corp. VII's and Corp. I's contractual intercompany tax attribute sales proceeds obligations in the sum of $25.2 million must be disregarded for lack of economic substance.[30] To be sure, the Commissioner is

---

**27.** Allocated intercompany tax liabilities created pursuant to Treas. Reg. § 1.1502–33(d)(2)(ii) are, therefore, the functional equivalent of the contractual intercompany tax attribute sales proceeds obligations at issue here, in every respect save one. Under Treas. Reg. § 1.1502–33(d)(2)(ii), each and every participant to the intercompany tax liability allocation, and the exchange(s) of funds made pursuant thereto, is a member of an affiliated group filing a consolidated tax return, *i.e.*, Doyon's affiliated group, inclusive of Corp. VII and Corp. I. In contrast, the intercompany tax attribute sales proceeds obligations at issue here result from transactions which were indisputably bankrolled by a participant *external* to the affiliated group, *i.e.*, Hilton.

**28.** From a purely financial accounting perspective, to use Corp. VII as an example, the intercompany allocation of tax liability has two initial consequences—(i) Corp. VII's earnings and prof-

its for the taxable year ended October 31, 1988, are reduced by $13.6 million, and (ii) Corp. VII accrues a $13.6 million liability, payable to Doyon. Treas. Reg. §§ 1.1502–33(d)(1), 1.1552–1(b)(2); Peel, *supra*, § 17:05, at 11. Corp. VII's earnings and profits are unaffected by the subsequent payment of the aforesaid $13.6 million to Doyon, an event which is treated no differently than any other payment of Corp. VII's accounts payable. Peel, *supra*, § 17:05, at 12.

**29.** For this reason, strictly speaking, "we cannot conclude that an intercompany payment of an allocated tax expense is comparable to an intercompany payment for the benefit of using the parent's losses and credits pursuant to a private contract." *Doyon*, 37 Fed.Cl. at 24.

**30.** Consistent with the approach taken by the accounting experts, but solely for clarity of presentation, the remainder of our analysis is ad-

not bound by the form of the transaction selected by the taxpayer, and may recharacterize the nature of the transaction so as to properly reflect its economic substance. *Don E. Williams Co. v. Commissioner,* 429 U.S. 569, 579–80, 97 S.Ct. 850, 51 L.Ed.2d 48 (1977); *Higgins v. Smith,* 308 U.S. 473, 477, 60 S.Ct. 355, 84 L.Ed. 406 (1940). Here at bar, however, the Government would reconfigure the familiar substance-over-form doctrine as a self-serving, baldly asserted " 'heads I win, tails you lose' proposition." *Panhandle Eastern Pipe Line Co. v. United States,* 408 F.2d 690, 718, 187 Ct.Cl. 129, 174 (1969); *see also Wall Industries, Inc. v. United States,* 10 Cl.Ct. 82, 106 (1986). Defendant cannot vigorously affirm the recognition of $80 million of assigned income by Corp. VII and Corp. I, on the one hand, and, yet, simultaneously disavow the recognition of $25.2 million of associated intercompany tax attribute sales proceeds obligations.[31] Assuming, *arguendo,* that the $25.2 million item must be disregarded as the artificial creature of shrewdly drafted contract language, defendant has suggested no reason why the $80 million item is not likewise suspect. That is, if we are to utilize the term "economic substance" in any meaningful sense, it goes without saying that the $80 million of assigned income in question was, in substance, earned not by Corp. VII and Corp. I, but solely by Hilton. Ordinarily, Hilton's assignment of $80 million of taxable income to Corp. VII and Corp. I would be deemed ineffective for federal income tax purposes, for under the venerable assignment of income doctrine it is well settled "that income is taxed to the party who earns it and that liability may not be avoided through an anticipatory assignment of that income." *United States v. Basye,* 410 U.S. 441, 447, 93 S.Ct. 1080, 35 L.Ed.2d 412 (1973). *See also Lucas v. Earl,* 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930); *Helvering*

*v. Horst,* 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (1940); *Yankee Atomic Electric Co. v. United States,* 782 F.2d 1013 (Fed.Cir.1986).

However, respecting the foregoing, Congress has expressly declared that the Commissioner may not employ familiar anti-abuse principles of our income tax law, *i.e.,* the assignment of income doctrine, in order to summarily invalidate sales of tax attributes by ANCs. *See* Pub.L. No. 99–514, § 1804(e)(4), 100 Stat. 2085, 2801 (1986); H.R.Conf.Rep. No. 841, 99th Cong., 2d Sess., at II–843, *reprinted in* 1986 U.S.C.C.A.N. 4075, 4931; *Doyon,* 37 Fed.Cl. at 25. In the present case, the Government seeks to implement this legislative mandate selectively and *sub silentio.* This is so notwithstanding defendant's hospitable concession that the assignment of income doctrine cannot prevent the $80 million of assigned income from being taken into account. Conversely, in the case of the associated $25.2 million of intercompany tax attribute sales proceeds obligations, defendant urges the court to apply substance-over-form principles. Lacking any reasoned explanation for the Government's incongruous position, and mindful that Congress has barred even the most fair and neutral application of judicially created anti-abuse principles to the subject transactions, the court surely cannot countenance defendant's attempt to apply such principles *arbitrarily.* Therefore, we are constrained to hold that the $25.2 million of intercompany tax attribute sales proceeds obligations incurred by Corp. VII and Corp. I must be given effect for purposes of computing their respective separate-company ANBIs during the period of their inclusion in Doyon's consolidated tax return for the taxable year ended October 31, 1988.

### B. *Existence Of Double Counting*

■ Having established that the $25.2 million of intercompany tax attribute sales pro-

---

dressed not to the $27.2 million of intercompany tax obligations recognized pursuant to Treas. Reg. § 1.1502–33(d)(2)(ii), *supra,* but to the contractually modified sum of $25.2 million. The foregoing distinction is immaterial to our conclusion, *infra,* that Doyon has failed to carry its ultimate burden of proving that the $25.2 million of consideration from the sale of its tax attributes to Hilton is double counted within its consolidated ANBI, *i.e.,* as a component of both the Disput-

ed Sum and the $80 million of assigned income recognized by Corp. VII and Corp. I.

**31.** Mr. Little, Doyon's accounting expert, offered a persuasive critique of defendant's position, testifying forcefully that "this is a serious case of ... the Government wanting to have [its] cake and eat it too." Tr. 151–52.

ceeds obligations of Corp. VII and Corp. I must be given effect for purposes of determining their respective *separate-company* ANBIs, it remains to be determined what the resultant effect upon Doyon's consolidated ANBI is. Specifically, the court must ascertain whether a consolidating elimination entry is the necessary concomitant to the recognition of the aforesaid intercompany tax attribute sales proceeds obligations. In determining consolidated ANBI, the purpose of a consolidating elimination entry is to prevent the duplication of items of intercompany income or expense, if any. § 56(f)(2)(J); Treas. Reg. § 1.56–1(d)(6)(i)(B)(1). *See also* H.R.Conf.Rep. No. 841, 99th Cong., 2d Sess., at II–274, *reprinted in* 1986 U.S.C.C.A.N. 4075, 4362. A consolidating elimination entry also serves the same purpose when a consolidated income statement is prepared in accordance with generally accepted accounting principles (GAAP). Kermit D. Larson & William W. Pyle, *Financial Accounting* 530 (3d ed.1986).[32] Reliance upon GAAP is appropriate, on this record, therefore, in deciding whether a consolidating elimination entry is required in the computation of consolidated ANBI, because Congress intended that this determination be made by reference to the method of consolidation that the taxpayer normally uses for financial statement purposes. S.Rep. No. 99–313, 99th Cong., 2d Sess. 532 (1986); *General Explanation of the Tax Reform Act of 1986, supra,* at 452–53.

Here at bar, however, it is neither clear nor evident what Doyon's normal method of financial statement consolidation is. The footnotes to Doyon's audited Annual Report for the year ended October 31, 1988—its "applicable financial statement" under § 56(f)(3)(A)—merely state, without elaboration, that "[i]ntercompany balances and transactions have been eliminated in consoli-

dation." JX 23 at 1126 n. 2. Moreover, Doyon plainly had no "normal" method of consolidation with respect to Corp. VII and Corp. I, inasmuch as these two companies were *never* previously included in any applicable financial statement issued by Doyon.

Turning to the pointed literature of GAAP, in search of further guidance, we are informed that "[t]he purpose of consolidated statements is to present, primarily for the benefit of the shareholders and creditors of the parent company, the results of operations and the financial position of a parent company and its subsidiaries [as of a specific period] essentially as if the group were a single company with one or more branches or divisions." Accounting Research Bulletin No. 51, ¶ 1 (1959) (ARB 51), *reprinted in* Financial Accounting Standards Board, *Original Pronouncements Issued Through June 1973,* at 75 (1989). Building upon the premise that consolidation accounting treats a group of affiliated companies as if it were a "single business enterprise," ARB 51 goes on to declare that intercompany profit or loss arising from transactions among the companies included within the consolidated group "should be eliminated." *Id.* at ¶ 6. Such highly generalized postulates of financial consolidation accounting are of limited assistance in resolving the specific factual inquiry before this court.[33] It comes as no surprise, perhaps, that the literature of GAAP yields no dispositive accounting treatment. "Accountants long have recognized that 'generally accepted accounting principles' are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions. 'Generally accepted accounting principles,' rather, tolerate a range of 'reasonable' treatments . . . ." *Thor Power Tool,* 439 U.S. at 544, 99 S.Ct. 773.

---

**32.** Of course, a consolidating elimination entry may also be required to prevent the duplication of balance sheet accounts, *i.e.,* assets, liabilities, and components of shareholders' equity. Larson & Pyle, *Financial Accounting, supra,* at 523–24; Robert N. Anthony & James S. Reece, *Accounting Principles* 273–75 (5th ed.1983). Since the determination of Doyon's consolidated ANBI is the ultimate question at hand, we address the subject of consolidating elimination entries only from the consolidated income statement perspective.

**33.** This is no doubt attributable, in part, to the fact that under GAAP, "a subsidiary should not be consolidated where control is likely to be temporary." ARB 51, ¶ 2. Here at bar, of course, even if Corp. VII and Corp. I would not ordinarily be consolidated with Doyon under GAAP, due to the transitory nature of their affiliation, § 56(f)(2)(C)(i) and Treas. Reg. § 1.56–1(d)(6)(i)(A) compel their consolidation with Doyon for AMT purposes.

Lacking any definitive guidance from the literature of GAAP as to whether, on this record, Doyon's proposed consolidating elimination entry in the sum of $25.2 million constitutes a "reasonable" financial accounting treatment, the court must perforce consult the conflicting views of the parties' respective accounting experts.[34]

Mr. Little, on Doyon's behalf, and Professor Buchanan, for the Government, have each prepared consolidation worksheets which purport to delineate their respective opinions regarding the compilation of pro forma consolidated *financial* statements inclusive of Doyon, Corp. VII, and Corp. I. PX 1 at 4; DX 1, Attachment G (attached hereto as Appendices A and B, respectively).[35] Both experts agreed that the $4,100,000 of income tax expense reported in Doyon's applicable financial statement, *i.e.*, its audited Annual Report for the year ended October 31, 1988, is also the proper amount of pro forma consolidated income tax expense.[36] Thus, as portrayed at Appendices A and B–1 by the experts, and summarized below, a consolidating elimination entry is required in order to reduce Doyon's pro forma consolidated income tax expense, only, by a credit in the sum of $25.2 million.

| Items | Amounts |
|---|---|
| Doyon income tax expense, per audited consolidated income statement | $ 4,100,000 |
| Corp. VII pro forma income tax expense | 14,000,000 |
| Corp. I pro forma income tax expense | 11,200,000 |
| Combined income tax expense | 29,300,000 |
| Consolidating elimination entry | (25,200,000) |
| Pro forma consolidated income tax expense | $ 4,100,000. |

Of course, it must be observed that the $25.2 million credit entry to pro forma consolidated income tax expense, standing alone, is irrelevant to the determination of Doyon's ANBI, which is required to be computed without regard to any federal income tax expense recorded for financial accounting purposes. § 56(f)(2)(B). However, financial accounting is premised upon a double entry system in which the sum of the debits recorded for a given transaction equal the sum of the credits recorded for that transaction. It is axiomatic, therefore, that where there is a credit, there must also exist a debit (or debits) of equal amount. Where the litigants and their respective experts part ways here at bar is over the effect, if any, of the offsetting debit (or debits), also in the sum of $25.2 million, on Doyon's consolidated ANBI.

**34.** Given the nature of the inquiry, at bar, the court feels compelled to reiterate that the opinions of the parties' accounting experts concerning "reasonable" interpretations of GAAP are neither conclusive nor binding upon the court. *See Dayton Power & Light*, 292 U.S. at 299, 54 S.Ct. 647; *Sartor*, 321 U.S. at 627–29, 64 S.Ct. 724; *Sternberger*, 185 Ct.Cl. at 535–36; *Mims*, 375 F.2d at 140 & n. 2. It has been observed that accountants "are quite prone to define 'generally accepted' as ... 'somebody tried it.'" Cannon, *Tax Pressures on Accounting Principles and Accountants' Independence*, 27 Accounting Rev. 419, 421 (1952), *quoted in Thor Power Tool*, 439 U.S. at 544 n. 22, 99 S.Ct. 773.

**35.** At Appendices A and B–1, *infra*, the columns titled "HIL–A VII Corp." and HILA "Corp. I" depict the pro forma separate-company income statements (i.e., earnings and profits) of Corp. VII and Corp. I, respectively. The accounting treatment portrayed in those two columns is consistent with the court's ruling as to the first issue decided herein, *supra*. That is, pursuant to the recognition of their $25.2 million of intercompany tax attribute sales proceeds obligations, Corp. VII and Corp. I should thereafter record $25.2 million of expense in reduction of their respective separate-company earnings and profits. The second issue for decision—whether, given the

foregoing, a consolidating elimination entry is required—pertains to what accounting entries, if any, must be made in the column titled "Eliminations" on Appendices A and B–1 in order to accurately measure Doyon's consolidated ANBI for its taxable year ended October 31, 1988.

**36.** PX 1 at 8–9; DX 1 at 4–5; Tr. 160. Said $4,100,000 represents Doyon's income tax expense attributable to earnings from continuing operations. Apps. A, B–1. Doyon's audited income statement also reflects an extraordinary item in the sum of $1,900,000, relating to the Federal income tax benefit associated with the utilization of a portion of Doyon's NOL carryforward. Neither party has suggested, nor does the court perceive, that Doyon's $1,900,000 extraordinary item relates in any fashion to the Hilton transactions. Furthermore, Congress intended that ANBI be computed without regard to extraordinary items of Federal income tax expense or benefit, such as an extraordinary tax benefit arising from the utilization of an NOL carryforward. S.Rep. No. 99–313, 99th Cong., 2d Sess., at 534; *General Explanation of the Tax Reform Act of 1986, supra*, at 455. *See also* Treas. Reg. § 1.56–1(d)(3)(i).

On Doyon's behalf, Mr. Little expressed the opinion that the $25.2 million debit component of the consolidating elimination entry must be recorded to an income statement account, *i.e.*, either the Disputed Sum or the $80 million of assigned income,[37] thereby reducing Doyon's consolidated ANBI from $159,723,568 to $134,523,568. Appendix A, *infra*, depicts the accounting treatment advocated by Mr. Little.[38] According to the transaction documents, Mr. Little testified, the Hilton transactions had a value of $80 million, the amount of the income assigned by Hilton to Corp. VII and Corp. I, of which $25.2 million was allegedly paid to Doyon as consideration for the use of its NOLs in sheltering the aforesaid $80 million of income. Mr. Little's view of the Hilton transactions closely parallels the "all-cash" hypothetical transaction argued in JX 31, wherein: (i) Hilton assigns $80 million of income to a single subsidiary called "HILA"; (ii) Hilton simultaneously transfers $80 million of cash to HILA; (iii) Hilton sells HILA to Doyon for $1; (iv) HILA's $80 million of assigned income is included within Doyon's consolidated taxable income;

(v) HILA pays Doyon cash in the sum of $25.2 million as compensation for the sheltering of its income by Doyon's NOLs; and (vi) Doyon sells HILA, including HILA's remaining $54.8 million in cash, back to Hilton for $1.[39] If, *from* $80 million of assigned income, $25.2 million is *in fact* transferred to Doyon and only $54.8 million is *in fact* returned to Hilton, argues Mr. Little, then, by necessary implication, the $80 million item must be inclusive of the $25.2 million item. Thus, in Mr. Little's opinion, absent a consolidating elimination entry recording a $25.2 million debit in reduction of Doyon's income before taxes, the Hilton transactions will, in essence, be improperly valued at $105.2 million, rather than $80 million. Mr. Little opined that he found no support for a valuation of $105.2 million in the transaction documents. Tr. 83–84.[40]

Conversely, Professor Buchanan testified that the offsetting $25.2 million debit must be recorded to income taxes payable, a liability account on Doyon's pro forma consolidated balance sheet, with the result that Doyon's consolidated ANBI is unaffected. Tr. 154, 158–59.[41] Appendix B–1, *infra*, illustrates

37. Although Doyon's consolidated ANBI worksheet, at App. A herein, records the debit portion of the $25.2 million consolidating elimination entry on the income statement line item titled "net proceeds from disposition of future income tax benefits," *i.e.*, the Disputed Sum, this $25.2 million debit could be just as easily recorded on the line titled "corporate and other revenues," reflecting the $80 million of assigned income. In either case, Mr. Little explained, the net effect on Doyon's consolidated ANBI is the same—a $25.2 million reduction. Tr. 75–76.

38. Mr. Little prepared no pro forma consolidated balance sheet pursuant to his analysis because, in his view, the ANBI calculation is concerned solely with pro forma consolidated net income before taxes, as to which balance sheet requirements are allegedly irrelevant. Tr. 79–80.

39. While Mr. Little gave no testimony concerning JX 31, he was the source of this hypothetical. Counsel for Doyon sketched JX 31 on a drawing board for demonstrative purposes during the cross-examination of Professor Buchanan. Tr. 136–37. In drawing JX 31, counsel held and openly relied upon a handwritten note prepared by Mr. Little.

40. Mr. Little also testified that Corp. VII and Corp. I could have recorded the $25.2 million item not as income tax expense, but as some

form of "other" expense. Tr. 66. Such "other" expense would, according to Mr. Little, be recorded as a component of financial statement income before taxes. Tr. 66. Mr. Little suggested this approach would conform the accounting treatment of the $25.2 million of expense recorded by Corp. VII and Corp. I to the court's prior ruling that the $25.2 million of income recorded by Doyon, *i.e.*, as part of the Disputed Sum, is not an item of "Federal income taxes" excludable from ANBI under § 56(f)(2)(B). *See Doyon*, 37 Fed.Cl. at 25. Moreover, Mr. Little reasoned, if Corp. VII and Corp. I recorded $25.2 million of "other" expense, in reduction of their respective income before taxes, this would even more clearly result in a $25.2 million reduction of Doyon's consolidated ANBI. Tr. 61–62. In any event, Mr. Little's "other expense" theory is plainly without merit, given our holding, *supra*, that Corp. VII and Corp. I recognized $27.2 million of allocated intercompany income tax expense for purposes of computing their earnings and profits, on which their separate-company ANBIs are based, pursuant to Treas. Reg. § 1.1502-33(d)(2)(ii).

41. At trial and in his written report, Professor Buchanan mainly contended that no consolidating elimination entry is necessary, because the $25.2 million of intercompany tax sharing obligations incurred by Corp. VII and Corp. I should be disregarded for lack of economic substance.

the foregoing accounting treatment. Professor Buchanan contended, in essence, that recording the aforesaid debit as a reduction of Doyon's consolidated ANBI would, contrary to Mr. Little's view, incorrectly understate the value of the Hilton transactions by $25.2 million. Attacking Mr. Little's treatment of the $25.2 million item as a recovery of a portion of the $80 million of assigned income, Professor Buchanan asserted that the $80 million item and the $25.2 million item are clearly distinct and severable elements of the actual Hilton transactions. According to Professor Buchanan, Corp. VII and Corp. I did not agree to pay the $25.2 million to Doyon out of their $80 million of assigned income, but rather, merely acted as "conduits" for *Hilton's* subsequent separate payment of $25.2 million to Doyon.[42] Thus, due to the *independence* of the $80 million assigned income item and the $25.2 million separate payment of consideration item, Professor Buchanan concluded, the Hilton transactions are properly includable in Doyon's consolidated ANBI at an aggregate value of $105.2 million. Said transactions, of course, net to only $25.2 million upon Hilton's repurchase of Corp. VII's and Corp. I's stock with the $80 million reverting *intact* to Hilton.[43]

Through their respective accounting experts, Mr. Little and Professor Buchanan, Doyon and the Government each present an accounting treatment falling within the realm of theoretical possibility, in the sense that neither treatment leads to a patently outrageous result that must be dismissed summarily. If the Hilton transactions are properly valued at only $80 million, as Doyon argues, then the $80 million of assigned income recognized by Corp. VII and Corp. I must be deemed inclusive of the $25.2 million of income recognized by Doyon as a component of the Disputed Sum. Such a finding, if appropriate, would compel the conclusion that a consolidating elimination entry recording a $25.2 million debit to Doyon's consolidated ANBI is necessary to prevent the averred duplication of the aforesaid $25.2 million item therein. Assuming, on the other hand, that the subject transactions are in fact properly valued at $105.2 million, as defendant maintains, there of course would be no double counting within Doyon's ANBI required to be cured by means of a consolidating elimination entry. But if Doyon's accounting treatment is to prevail, it obviously must do so solely on the strength of the evidence presented by Doyon at trial. However, the court is constrained to conclude that Doyon, on this record, has clearly failed to carry its burden of overcoming the presumptive correctness of the Commissioner's determination as well as establishing each element of its claim by a preponderance of the evidence.

Rather than presenting probative evidence from which it might be reasonably inferred that the Hilton transactions are properly valued at $80 million, Doyon merely offers its *naked opinion* to this effect. Mr. Little never explicated or proffered *any* probative factual documentary basis for his conclusion that $80 million is the proper valuation of the Hilton transactions. Instead, Mr. Little merely opined blandly that the Government's valuation of the Hilton transactions, at $105.2

---

Our conclusion, *supra*, that Corp. VII and Corp. I recognized substantial allocated intercompany tax liabilities pursuant to Treas. Reg. § 1.1502–33(d)(2)(ii) disposes of Professor Buchanan's principal contention. Consequently, the court addresses Professor Buchanan's apparent fallback position.

**42.** Professor Buchanan readily admitted that the "all-cash" hypothetical transaction portrayed in JX 31 is arguably, but not factually, similar to the actual Hilton transactions and, further, that it makes no difference whether some or all of the $80 million of assigned income was payable not in cash, but in the form of promissory notes due at a later date. In either case, Professor Buchanan maintained, Doyon would nevertheless recognize $105.2 million of income in its pro form consolidated financial statements.

**43.** Of course, the ultimate reversion of the $80 million of re-assigned income to Hilton is no ground for excluding said $80 million from Doyon's consolidated ANBI. As noted herein, *supra*, each corporation which joined in the filing of Doyon's consolidated tax return for the taxable year ended October 31, 1988 must be taken into account in determining Doyon's consolidated ANBI for that year. § 56(f)(2)(C)(i); Treas. Reg. § 1.56–1(d)(6)(i)(A). Consequently, the $80 million of assigned income recognized by Corp. VII and Corp. I while affiliated with Doyon is necessarily a component of Doyon's consolidated ANBI.

million, finds no support in the underlying transaction documents. Even assuming that Mr. Little's conclusion is accepted as true, which it is not, Doyon's exclusive reliance upon his opinion in this regard gravely misperceives the allocation of the burden of proof in an income tax refund case. This is so because it is *not* the Government's burden to demonstrate that the transaction documents support a value of $105.2 million. On the contrary, *Doyon* has the unquestionable burden of affirmatively demonstrating, by a preponderance of the evidence, that its consolidated group—Doyon, Corp. VII, and Corp. I, viewed as a single business enterprise—was required to recognize not more than $80 million of financial statement income as a result of transactions with a party external to the consolidated group, *i.e.,* Hilton.

Under GAAP, it is axiomatic that the objective of consolidation accounting is to treat the consolidated group as the equivalent of a "single business enterprise." ARB 51, *supra,* ¶ 6. Although not dispositive, *Thor Power Tool,* 439 U.S. at 542–44, 99 S.Ct. 773, the "single business enterprise" principle is a useful adjunct to the court's considerations concerning the appropriate accounting treatment for the subject transactions. Professor Buchanan testified persuasively that consolidating elimination entries are premised upon the requirement that a consolidated financial statement must not overstate the volume of business done by the consolidated entity with the outside world. *See also* Anthony & Reece, *Accounting Principles, supra,* at 274. Thus, from the perspective of the "single business enterprise," it is manifestly clear that whether a consolidating elimination entry reducing Doyon's consolidated ANBI by the sum of $25.2 million is required depends upon whether, in the absence of such an entry, transactions between the Doyon consolidated group and Hilton would be overstated by the sum of $25.2 million. We are thoroughly unconvinced that such an overstatement is evidenced on this record.

For purposes of determining Doyon's consolidated ANBI, it is undisputed that the Doyon consolidated group transacted $80 million of business with Hilton, at a mini-

mum, by virtue of Hilton's assignment of income to Corp. VII and Corp. I, for the purpose of absorbing Doyon's NOLs. As a further consequence of the foregoing assignment of income, Hilton derived an income tax benefit, for which it agreed to pay the Doyon group the sum of $25.2 million as *bona fide* consideration for the sale of tax benefits. Inasmuch as Doyon itself reported this $25.2 million item as income in its audited Annual Report, as a component of the Disputed Sum, it would strain credulity to contend that another $25.2 million of business was not transacted between the Doyon group and Hilton. Indeed, even Mr. Little, plaintiff's expert, conceded that the "real world" economic substance of the subject transactions was Doyon's actual receipt of $25.2 million of income. This is irrefutable inasmuch as the $80 million of previously assigned income was returned to Hilton *in full* upon its repurchase of the stock of Corp. VII and Corp. I. In short, therefore, we hold that the record manifestly and persuasively demonstrates that for the taxable year ended October 31, 1988, the Doyon group, viewed as a single business enterprise, transacted not less than $105.2 million of business with Hilton, *i.e.* the assignment of $80 million in income to Corp. VII and Corp. I, of the consolidated group and the $25.2 million consideration for the sale/purchase of tax benefits.

Doyon's misplaced emphasis on Corp. VII and Corp. I cannot obscure this elementary fact. As Professor Buchanan observed at trial, Doyon sold a resource—the tax benefit from using its NOLs—to Hilton, an unaffiliated company. As a result, the Doyon group realized a $25.2 million influx of resources (*i.e.,* sales proceeds) from an external source. *See Doyon,* 37 Fed.Cl. at 24–25. Had Hilton expressly agreed to pay the $25.2 million directly to Doyon, omitting Corp. VII and Corp. I as intermediaries, Doyon's consolidated ANBI would quite clearly include said $25.2 million as a separate item of income in addition, of course, to the $80 million of assigned income recognized by Corp. VII and Corp. I. The mere fact that Corp. VII and Corp. I acted as naked agents for Hilton's payment of the $25.2 million to Doyon cannot alter the foregoing result. To find, on this record, for plaintiff on its self-serving and

hospitable theory would be tantamount to holding that, where taxpayer "A" sells intangible personal property, *i.e.*, income tax attributes, with a zero basis for $25.2 million and realizes a $25.2 million profit, "A" will not be required to include the sales proceeds in its income.

While it is no doubt true, as Doyon points out, that under the statutory scheme authorizing sales of tax attributes by ANCs, Corp. VII and Corp. I were needed to effect the transfer of $80 million of Hilton's taxable income into Doyon's consolidated tax return, from this truism it does not automatically follow that routing Hilton's payment of $25.2 million through these companies was likewise necessary. Stated differently, DEFRA § 60(b)(5) authorized a contractual mechanism by which a corporate taxpayer could transfer its taxable income into the consolidated tax return of an ANC, there to be sheltered by the ANC's NOLs, but Congress declined to prescribe any specific method by which the beneficiary of such sheltering had to compensate the benefactor. Since Congress left such matters to the contracting parties, the merits of Doyon's claim that the $80 million of assigned income is inclusive of the $25.2 million tax sharing payment are dependent upon, and must be considered in light of, the structure of the transactions delineated by the contractual arrangements between Doyon, Hilton, Corp. VII, and Corp. I.

Merely because Corp. VII and Corp. I possessed contractual rights entitling them to $80 million of assigned income, it does not, *ipso facto*, follow that the $80 million of assigned income was inclusive of the $25.2 million of consideration respecting Doyon's sale of its tax attributes. Quite the contrary, nothing in the contracts earmarks the $80 million, in whole or in part, as the source of the $25.2 million.[44] Whereas it is indisputable that the $25.2 million was, in fact, proceeds received by Doyon from the sale of intangible personal property (*i.e.*, the benefit from the utilization of its NOL carryforwards), paid by Hilton from sources unknown, the source of the assigned income recognized by Corp. VII and Corp. I was, in both cases, a $40 million allocation of income from a limited partnership formed by Hilton. Neither Corp. VII nor Corp. I executed an assignment of proceeds or pledge of their $80 million of assigned income in Doyon's favor in order to secure the payment of their respective sales contract obligations. Such an assignment or pledge, we note, would have been meaningless in any event, inasmuch as Corp. VII and Corp. I had already pledged, to none other than *Hilton*, a security interest in *all* of their assets, including, without limitation: (i) their entire respective interests in the limited partnerships from which the $80 million of assigned income came, including *all* distributions of cash or other property by said limited partnerships; *and* (ii) "*all* rights to the payment of money and other contract rights of [Corp. VII and Corp. I] under the Tax Sharing Provisions" pursuant to which Doyon was paid $25.2 million. JX 3 at 382,

44. Based upon the parties' stipulations of fact, Doyon warmly urges that the $25.2 million arose from the obligations of Corp. VII and Corp. I to pay a "percentage ... *of* each dollar of taxable income transferred" *i.e.*, the $80 million of assigned income. PPF at 5, ¶ 12; *id.* at 8, ¶ 19 (emphasis added). Perhaps, the plain language of the stipulations in question *arguably* supports Doyon's contention. JX 2 at 6, ¶ 23; *id.* at 8, ¶ 30. However, the plain language of the *contracts* fails to employ this construction. For example, Corp. VII was required to pay Doyon "an amount equal to the product of the federal gross income recognized by [Doyon] multiplied by 'the federal tax sharing percentage [*i.e.*, 35%]'...." JX 3 at 395. *See also* JX 4 at 540a (to same effect respecting Corp. I). We are of the opinion that the foregoing *contract* language merely fixes the measure of the compensation payable to Doyon, for the sake of convenience, as a simple percentage of the assigned income (as opposed to, say, a flat sum). Counsel for Doyon conceded that this is a reasonable construction of the contract language in question.

In such matters, it is firmly settled that litigants may not stipulate the court into error. *International Paper Co. v. United States*, 39 Fed. Cl. 478, 481–82 (1997) (citing *Swift & Co. v. Hocking Valley Ry. Co.*, 243 U.S. 281, 289, 37 S.Ct. 287, 61 L.Ed. 722 (1917); *Kaminer Constr. Corp. v. United States*, 203 Ct.Cl. 182, 197, 488 F.2d 980, 988 (1973)). Against such background, "the trial court has a duty to reject stipulations which are demonstrably false." *Dillon, Read & Co., Inc. v. United States*, 875 F.2d 293, 300 (Fed.Cir.1989). Therefore, where, as here, a stipulation purports to describe or clarify the nature of a party's contractual obligation, the court must reject an interpretation of said stipulation which is at odds with the contract itself.

¶ 5.1; JX 4 at 528, ¶ 5.1. Thus, we are unable, on this record, to conclude that Doyon has traced the alleged lineage of the $25.2 million of consideration for the sale of its tax attributes to the foregoing $80 million of partnership income.

In short, Doyon attempts to paint Corp. VII's and Corp. I's contractual rights to $80 million of assigned income as the sole conceivable source of funding from which their $25.2 million of intercompany tax attribute sales proceeds obligations could be satisfied. However, Doyon neglects to account for the contract provision most proximately related to the ultimate payment of the $25.2 million—Hilton's independent guarantee of the aforesaid obligations. The court has no reason to look to the $80 million of assigned income as the source of the $25.2 million of contractual payments, since it is patently obvious that Corp. VII and Corp. I were not obliged to do so. With respect to any action, or inaction, on the part of Corp. VII and Corp. I, Hilton's guarantee was completely unconditional.[45] Therefore, we are unpersuaded that Corp. VII and Corp. I were supposed to pursue collection of their $80 million of assigned income, as opposed to remaining dormant while Hilton honored its guarantee, in order to fund their $25.2 million of contractual obligations.

The evidence overwhelmingly pinpoints Hilton—the putative guarantor of Corp. VII's and Corp. I's obligations—as the party that was truly obliged to pay the contractual consideration of $25.2 million. Doyon concedes that there is *no* evidence suggesting that *any* portion of the $25.2 million was ever held, even momentarily, in bank accounts owned by Corp. VII or Corp. I. It is clear beyond cavil, therefore, that on July 31, 1992, Doyon received $16.8 million of this sum by wire transfer *directly from Hilton.* Although the record fails to precisely disclose the origin of the $8.4 million paid to Doyon on December 18, 1987, respecting Corp. VII, from the totality of the circumstances, we are constrained to infer that Hilton was the source, given the absence of any evidence to the contrary.[46] It is patently clear that nothing in the record supports an inference that this $8.4 million came from Corp. VII and/or Corp. I.

The foregoing circumstances, considered from the viewpoint of the Doyon consolidated group—Doyon, Corp. VII, and Corp. I, treated as a single business enterprise—compel the holding that there is no proven threat of double counting. On this record, Hilton's $80 million assignment of income and Hilton's $25.2 million payment of the sales consideration are properly viewed as two *separate* acts or transfers of economic resources to the Doyon group that were made pursuant to *independent contractual undertakings.* As such, we find that the aforesaid transactions are appropriately reflected in Doyon's consolidated ANBI at their full aggregate value of $105.2 million. Accordingly, the court holds that Doyon has not proven its entitlement to a consolidating elimination entry reducing its consolidated ANBI by the sum of $25.2 million.

Turning, at last, to Doyon's grossly oversimplified "all-cash" hypothetical (JX 31), we find it to be totally inapposite. Assuming, without deciding, that Doyon's hospitable hypothetical presents a transaction structure wherein the $80 million of assigned income *might* be deemed inclusive of the $25.2 million of intercompany tax attribute sales proceeds obligations, said transaction structure clearly is *not* the one that Doyon and Hilton chose to implement in the present case. As duly noted at an earlier stage of this litigation, familiar principles of federal income tax law reject such unadulterated conjecture as a source of proof, for it is settled law that "a transaction is to be given its effect in accord with what actually occurred and not in accord with what might have occurred." *Commissioner v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 148, 94 S.Ct. 2129, 40 L.Ed.2d 717 (1974), *quoted in Doyon,* 37 Fed.Cl. at 23. Consequently, although a "taxpayer is free to organize his affairs, nev-

---

**45.** The sole condition upon the performance of Hilton's guarantee was *Doyon's* noninterference with the performance of the tax sharing provisions of the subject contracts.

**46.** In fact, Mr. Little, plaintiff's accounting expert, admitted that the $14 million in cash regarding Corp. VII came from Hilton, the unrelated entity.

ertheless, having done so he must accept the tax consequences of his choices whether contemplated or not, and may not enjoy the benefit of some other route he might have chosen to follow but did not." *National Alfalfa,* 417 U.S. at 149, 94 S.Ct. 2129 (citations omitted). Thus, the tax consequences of the Hilton transactions must flow from the underlying contracts, as written, not from Doyon's later allegations of what the contracting parties intended. *See Lane Bryant, Inc. v. United States,* 35 F.3d 1570, 1574–76 (Fed. Cir.1994), *following Commissioner v. Danielson,* 378 F.2d 771 (3d Cir.) (*en banc* ), *cert. denied,* 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967); *International Paper,* 33 Fed.Cl. at 390–91.[47]

Because Doyon has totally failed to prove by a preponderance of the evidence that its consolidated ANBI, as determined by the Commissioner, duplicates $25.2 million of income, we hold that no consolidating elimination entry decreasing Doyon's consolidated ANBI by the sum of $25.2 million is required. Stated differently, on this record, plaintiff's proof has failed to overcome the presumptive correctness of the determination of the Commissioner.

## CONCLUSION

For all of the foregoing reasons:

1. We hold that defendant is entitled to judgment on count two of the amended complaint, with respect to plaintiff's claim for a refund of AMT and environmental tax allegedly overpaid for its taxable year ended October 31, 1988. The foregoing is warranted inasmuch as plaintiff has failed to prove, by a preponderance of the evidence, that a consolidating elimination entry is required in order to prevent the $25.2 million of consideration Doyon received from the sale of its tax attributes to Hilton from being double counted within plaintiff's consolidated ANBI for said taxable year. However, plaintiff is entitled to judgment in the sum of $2,119.51, plus interest as allowed by law, respecting the stipulated amount of interest and penalties overpaid for its taxable year ended October 31, 1988. Pursuant to RCFC 54(b), as there is no just reason for delay, the Clerk shall enter judgment consistent with the foregoing, with respect to plaintiff's second cause of action.

2. Regarding count three of the amended complaint, the court hereby makes the following findings of fact, at the request of the parties, in accordance with paragraphs 2 through 6, inclusive, of the parties' First Supplemental Stipulation, filed June 25, 1996:

A. "Plaintiff is entitled to a deduction for a net loss of $544,713 for its taxable year ended October 31, 1990, with respect to the abandonment of oil and gas leases as alleged in paragraph 42 of the first amended and supplemental complaint";

B. "Plaintiff is entitled to additional alternative minimum tax net operating loss in the amount of $330,029 for its taxable year ended October 31, 1990, as alleged in paragraph 45 of the first amended and supplemental complaint";

C. "Plaintiff's income for its taxable year ended October 31, 1990 [shall be] increased in the amount of $300,000 with respect to an option payment"; and

D. "Plaintiff's tax liabilities for its taxable year ended October 31, 1990 [shall be] computed in accordance with the ultimate resolution of the litigated issues and with the terms of the ... [sic] stipulation."

3. The parties shall confer and prepare a joint status report informing the court of their expectations and intentions respecting the entry of final judgment as to plaintiff's taxable year ended October 31, 1990, and shall file same with this court within fourteen (14) days from the date of this opinion, *i.e.,* on or before August 26, 1998.

IT IS SO ORDERED.

---

**47.** This principle is, of course, entirely consistent with our rejection, *supra,* of the Government's attempt to arbitrarily apply the substance-over-form doctrine.

## APPENDIX A

| | Doyon, Ltd. & Subsidiaries | HIL–A VII Corp | HILA Corp I | Eliminations | Doyon, Ltd. & Subsidiaries Pro Forma Consolidated |
|---|---|---|---|---|---|
| Operating Revenues | 32,939,621 | | | | 32,939.621 |
| Operating Expenses | (22,615,270) | | | | (22,615,270) |
| Operating Income | 10,324,351 | 0 | 0 | | 10,324,351 |
| Natural resource revenues from other regions | 943,280 | | | | 943,280 |
| Equity in loss of affiliates | (51,713) | | | | (51,713) |
| Corporate & other revenues | 235,011 | 40,000,000 | 40,000,000 | | 80,235,011 |
| Corporate general and admin. expenses | (4,966,023) | | | | (4,966,023) |
| Interest income | 6,945,027 | | | | 6,945,027 |
| Interest expense | (1,046,503) | | | | (1,046,503) |
| Minority interest in earnings of joint venture | (2,850,643) | | | | (2,850,643) |
| Loss from write-down of securities | (315,312) | | | | (315,312) |
| Net proceeds from disposition of future income tax benefits | 70,506,093 | | | (25,200,000) | 45,306,093 |
| | 79,723,568 | 40,000,000 | 40,000,000 | | 134,523,568 |
| Income tax (expense) benefit | (4,100,000) | (14,000,000) | (11,000,000) | 25,200,000 | (4,100,000) |
| Earnings from continuing operations | 75,623,568 | 26,000,000 | 28,800,000 | | 130,423,568 |
| Extraordinary item—benefit from utilization of net operating loss carryforward | 1,900,000 | | | | 1,900,000 |
| Net income | 77,523,568 | 26,000,000 | 28,800,000 | | 132,323,578 |

NOTES:

1. This schedule depicts Doyon's view of its consolidated ANBI computation for its taxable year ended October 31, 1998, including consolidating elimination entries, as reflected in Plaintiff's Ex. 1 (Little report) at 4.

2. Figures in the leftmost column correspond to Doyon's audited consolidated income statement for its year ended October 31, 1998. JX 23 at 1122.

3. Figures in the columns headed "Hil–A VII Corp." and "Hila Corp. I" are stipulated by the parties or otherwise undisputed. JX 2 at ¶¶ 21, 23, 28, 30, 71, 74.

## APPENDIX B–1

| | Doyon, Ltd. & Subsidiaries | Hil–A VII Corp | Hila Corp I | Eliminations | Doyon, Ltd. & Subsidiaries Pro Forma |
|---|---|---|---|---|---|
| Operating revenues | 32,939,621 | | | | 32,939,621 |
| Operating expenses | (22,615,270) | | | | (22,615,270) |
| Operating income | 10,324,351 | | | | 10,324,351 |
| Natural resource revenues from other regions | 943,280 | | | | 943,280 |
| Equity in loss of affiliates | (51,713) | | | | (51,713) |
| Corporate & other revenues | 235,011 | 40,000,000 | 40,000,000 | | 80,235,011 |
| Corporate general & admin. expenses | (4,966,023) | | | | (4,966,023) |
| Interest income | 6,945,027 | | | | 6,945,027 |
| Interest expense | (1,046,503) | | | | (1,046,503) |
| Minority interest in earnings of joint ventures | (2,850,643) | | | | (2,850,643) |
| Loss on write-down of securities | (315,312) | | | | (315,312) |
| Net proceeds from disposition of future income tax benefits | 70,506,093 | | | | 70,506,093 |
| | 79,723,568 | 40,000,000 | 40.000,000 | | 159,723,568 |
| Income tax (expense) benefit | (4,100,000) | (14,000,000) | (11.200,000) | 25,200,000 | (4,100,000) |
| Earnings from continuing operations | 75,623,568 | 26,000,000 | 28,800,000 | 25,200,000 | 155,623,568 |
| Extraordinary item—benefit from utilization of net operating loss carry forward | 1,900,000 | | | | 1,900,000 |
| Net income | 77,523,568 | 26,000,000 | 28,800,000 | 25,200.000 | 157,523,568 |

## APPENDIX B–1—Continued

NOTES:

1. This schedule depicts defendant's view of Doyon's consolidated ANBI computation for its taxable year ended October 31, 1988, including consolidating elimination entries, as reflected in Defendant's Ex. 1 (Buchanan report), Attachment G.

2. Figures in the leftmost column correspond to Doyon's audited consolidated income statement for its year ended October 31, 1988. JX 23 at 1122.

3. Figures in the columns headed "Hil–A VII Corp." and "Hila Corp. I" are stipulated by the parties or otherwise undisputed. JX 2 at ¶¶ 21, 23, 28, 30, 71, 74.

### APPENDIX B–2

| | Doyon, Ltd. & Subsidiaries | Hil–A VII Corp | Hila Corp I | Eliminations | Doyon, Ltd & Subsidiaries Pro Forma |
|---|---|---|---|---|---|
| Cash & cash equivalents | 64,536,541 | | | | 64,536,541 |
| Receivables | 4,389,310 | 40,000,000 | 40,000,000 | | 84,389,310 |
| Prepaid expenses | 607,310 | | | | 607,310 |
| Investments | 174,700 | | | | 174,700 |
| Marketable securities | 39,977,208 | | | | 39,977,208 |
| Oil and gas leases | 1,589,516 | | | | 1,589,516 |
| Property and equipment, at cost | 55,430,290 | | | | 55,430,290 |
| Accumulated depreciation | (21,955,323) | | | | (21,955,323) |
| Total assets | 144,749,552 | 40,000,000 | 40,000,000 | | 224,749,552 |
| Current installments of debt | 2,290,130 | | | | 2,290,130 |
| Accounts payable | 1,509,986 | | | | 1,509,986 |
| Accrues expenses | 1,759,158 | | | | 1,759,158 |
| Dividend payable | 4,530,500 | | | | 4,530,500 |
| Deferred revenue | 365,306 | | | | 365,306 |
| Income taxes payable | 2,200,000 | 14,000,000 | 11,200,000 | (25,200,000) | 2,200,000 |
| Long-term debt | 6,318,590 | | | | 6,318,590 |
| Minority interest in joint venture | 12,875,897 | | | | 12,875,897 |
| Total liabilities | 31,849,567 | 14,000,000 | 11,200,000 | (25,200,000) | 31,849,567 |
| Class A common stock | 39,915,228 | | | | 39,915,228 |
| Class B common stock | 13,864,978 | | | | 13,864,978 |
| Retained earnings | 59,120,105 | 26,000,000 | 28,800,000 | 25,200,000 | 139,120,105 |
| Total stockholder's equity | 112,900,311 | 26,000,000 | 26,000,000 | 25,200,000 | 192,900,311 |
| Total liabilities & equity | 144,749,878 | 40,000,000 | 40,000,000 | — | 224,749,878 |

NOTES:

1. This schedule depicts defendant's view of Doyon's consolidated ANBI computation for its taxable year ended October 31, 1988, including consolidating elimination entries, as reflected in Defendant's Ex. 1 (Buchanan report), Attachment G.

2. Figures in the leftmost column correspond to Doyon's audited consolidated balance sheet as of October 31, 1988. JX 23 at 1120–21.

## APPENDIX C

Treasury Regulation (26 C.F.R.) § 1.1502–33, as in effect during the taxable year ended October 31, 1988, provides, in relevant part:

§ 1.1502–33 Earnings and profits.

\* \* \* \* \* \*

(d) *Federal income tax liability—*

 (1) *In general.*

 For the purpose of determining the earnings and profits of each member of a group for a consolidated return year beginning after December 31, 1965, the tax liability of the group for such year may be allocated among the members in accordance with subparagraph (2)(i), (ii), or (iii) of this paragraph, if an election is made in accordance with subparagraph (3) of this paragraph. Allocations

APPENDIX C—Continued

of tax liability made in accordance with subparagraph (2) of this paragraph shall be treated as allocations of the tax liability of the group for taxable years beginning after December 31, 1965, even though the sum of the amounts allocated for a taxable year may exceed the tax liability of the group as determined under paragraph (b)(1) of § 1.1552–1. See paragraph (b)(2) of § 1.1552–1 for the effect of the allocations.

(2) *Methods of allocation.*

\* \* \* \* \* \*

(ii) (*a*) The tax liability of the group, as determined under paragraph (b)(1) of 1.1552–1, shall be allocated to the members in accordance with paragraph (a)(1), (2), or (3) of 1.1552–1, whichever is applicable;

(*b*) An additional amount shall be allocated to each member equal to a fixed percentage (which does not exceed 100 percent) of the excess, if any, of (1) the separate return tax liability of such member for the taxable year (computed as provided in paragraph (a)(2)(ii) of 1.1552–1), over (2) the tax liability allocated to such member in accordance with (*a*) of this subdivision (ii); and

(*c*) The total of any additional amounts allocated pursuant to (*b*) of this subdivision (ii) (including amounts allocated as a result of a carryback) shall be credited to the earnings and profits of those members which had items of income, deductions, or credits to which such total is attributable pursuant to a consistent method which fairly reflects such items of income, deductions, or credits, and which is substantiated by specific records maintained by the group for such purpose.

\* \* \* \* \* \*

(3) *Method of election.*

(i) In the event a group desires to allocate its tax liability in accordance with a method provided in subparagraph (2)(i) or (ii) of this paragraph, for a consolidated return year beginning after December 31, 1965, an election to that effect shall be made within the time prescribed by law for filing the consolidated return for the first taxable year to which the group desires the election to apply (including extensions thereof), or within 60 days after July 3, 1968, whichever is later. The election shall be made by attaching a statement to the consolidated return for the first taxable year to which the group desires the election to apply.... An election once made under this subparagraph shall be irrevocable and shall be binding upon the group with respect to the year for which made and for all future consolidated return years of the group unless the Commissioner authorizes a change to another method prior to the time prescribed by law for filing the return for the year in which such change is to be effective.

(ii) If a group does not make an election under this subparagraph for a taxable year ending before July 1, 1968, it may not thereafter make such an election without the approval of the Commissioner unless the election is made for the first consolidated return year of the group.

\* \* \* \* \* \*

(4) *Examples.*

The provisions of this paragraph may be illustrated by the following examples:

*Example (1).*

(i) Corporation P is the common parent owning all of the stock of corporations S1 and 2, members of an affiliated group. A consolidated return is filed for the taxable year ending December 31, 1966, by P, S1, and S2. The group has made an election in accordance with subparagraph (3) of this paragraph to use the method of allocation provided in subparagraph (2)(i) of this paragraph in conjunction with paragraph (a)(1) of § 1.1552–1. For 1966, the corporations had the following taxable incomes or losses computed as if separate returns were actually filed for such year:

P ................................................................. 0
S1 ................................................................ $2,000
S2 ................................................................ (1,000)

\* \* \* \* \* \*

*Example (2).*

Assume the same facts as in example (1) except that the group elected in accordance with subparagraph (3) of this paragraph to use the method of allocation provided in subparagraph (2)(ii) of this paragraph, choosing a fixed percentage of 100 percent under subparagraph (2)(ii)(b) of this paragraph. Assume also that the taxable incomes and losses of the corporations shown in example (1) would be the same amount if computed as provided in paragraph (a)(2)(ii) of § 1.1552–1. Thus, for 1966, $440 is allocated to S1 (the $220 tax liability of the group, and an additional $220 pursuant to subparagraph (2)(ii)(b) of this paragraph). The earnings and profits of S1 are reduced in the amount of 440, and the earnings and profits of 2 are increased in the amount of $220 because the $220 allocated to S1 which is in addition to the tax liability of the group is attributable to deductions of S2....